969 A.2d 1197

James C. CLIFTON, Charles and Lorrie Cranor, Husband and Wife, and Roy Simmons and Mary Lisa Meier, Husband and Wife, Appellees

v.

ALLEGHENY COUNTY, Appellant

Kenneth Pierce and Stephanie Beechaum, Appellees

v.

Allegheny County, Pennsylvania, Daniel Onorato, Its Chief Executive, and Deborah Bunn, Its Chief Assessment Officer, Appellants.

Supreme Court of Pennsylvania.

Argued Sept. 10, 2008.

Decided April 29, 2009.

666

Michael Henry Wojcik, Esq., John Anthony Mulroy, Esq., Robert James Reith, Esq., George M. Janocsko, Esq., Allegheny County Law Department, for Allegheny County (20 WAP 2007).

Anthony T. McBeth, Esq., Robert L. Knupp, Esq., Knupp Law Offices, LLC, Harrisburg, for amicus curiae The County Commissioners Association of Pennsylvania (20 WAP 2007, 21 WAP 2007).

M. Janet Burkardt, Esq., Ira Weiss, Esq., Robert Maxwell Junker, Esq., Law Offices of Ira Weiss, Pittsburgh, for James C. Clifton, et al. (20 WAP 2007).

Raymond L. Billotte, for Court Administrator of Allegheny County (20 WAP 2007).

Michael Henry Wojcik, Esq., John Anthony Mulroy, Esq., Robert James Reith, Esq., George M. Janocsko, Esq., Allegheny County Law Department, for Allegheny County, et al. (21 WAP 2007).

Donald F. Driscoll, Esq., Kevin Lewis Quisenberry, Esq., Community Justice Project, Pittsburgh, for Kenneth Pierce and Stephanie Beechaum (21 WAP 2007)

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## OPINION

Chief Justice CASTILLE.

"Controversies growing out of the assessment and collection of taxes are as old as civilization. To question the assessment, to doubt the levy, and to delay the collector may be classed among those inalienable rights of mankind not guaranteed by any Constitution, but very generally asserted under the law of human nature." *Delaware, L. & W.R. Co.'s Tax Assessment*, 224 Pa. 240, 73 A. 429, 430 (1909). The present appeals call for us to consider the constitutionality of Pennsylvania's property assessment laws.[1] Presently, the assessment laws of the Commonwealth neither require nor do they prohibit periodic property reassessments, and thus they permit real estate taxes to be levied on property values that are based upon a stagnant "base year market value" for an indefinite period of time. Allegheny County has adopted such a base year system. In a thorough opinion and order, the Court of Common Pleas of Allegheny County, per the Honorable R. Stanton Wettick, Jr., found that, because a base year assessment method that does not require periodic reassessments inherently causes significant disparities in the ratio of assessed value to fair market value, the Commonwealth's property assessment laws were facially unconstitutional as they violate the Uniformity Clause of the Pennsylvania Constitution, PA. CONST. art. VIII, § 1, which requires equality of taxation. In Judge Wettick's view, the only option for the County was an annual reassessment. For the reasons that follow, we disagree with the trial court's holding that the statutes are unconstitutional on their face. Nevertheless, for many of the same reasons cited by the trial court, we hold that the base year method of property valuation, as applied in Allegheny County, violates the Uniformity Clause. We therefore agree that a countywide

1. When referring generally to "assessment laws," we are referring to the General County Assessment Law, 72 P.S. §§ 5020-1 to –602, the First Class County Assessment Law, 72 P.S. §§ 5341.1–5341.21, the Second Class County Assessment Law, 72 P.S. §§ 5452.1–5452.20, the Second Class A and Third Class County Assessment Law, 72 P.S. §§ 5342–5350k, and the Fourth to Eighth Class County Assessment Law, 72 P.S. §§ 5453.101–5453.107.

reassessment is required and we remand this matter to the trial court for implementation of that mandate consistent with this Opinion.

## I. Background

Initially measured by a tract of land's agricultural productivity, property taxes were regularly administered in ancient Egypt, Babylon, and Persia. Richard Henry Carlson, *A Brief History of Property Tax*, FAIR & EQUITABLE, Feb. 2005, at 3–4.[2] In medieval England, each parcel of land was measured and had its value estimated, with the resulting property assessment and tax liability entered into the town's *Domesday Book.* In the Seventeenth Century, a hearth tax was administered in England and some of its colonies, which estimated a building's value according to the number and size of its hearths. In colonial America, revenue was raised by many colonies through a general property tax, which assessed the value of land, buildings, animals, and personal property; and while the tax rate was generally higher than it is today, properties were routinely under-assessed. *Id.* at 5–6. In the early United States, national property taxes such as the "window tax," which, in addition to a land tax, assessed real estate according to the number and size of a building's windows and doors, caused unrest and, at times, rebellion.[3] With the development of a mercantile economy, and later an industrial economy, the property tax was supplanted, first by the excise tax, and later by the income tax. *Id.* at 5–8.[4] Nevertheless, through the Nineteenth Century, property tax was the primary form of taxation at the state and local level. John Joseph Wallis, *A*

---

**2.** FAIR & EQUITABLE is the monthly magazine of the International Association of Assessing Officers. A copy of this article is available at http://www.iaao.org/uploads/A BriefHistoryofPropertyTax.pdf.

**3.** For example, in Fries' Rebellion, German settlers in Pennsylvania led by John Fries revolted against the window tax by intimidating tax assessors and forcing them away from the homes they were meant to assess. Carlson, *supra*, at 7.

**4.** An excise tax is a "tax imposed on the manufacture, sale, or use of goods (such as a cigarette tax), or on an occupation or activity (such as a license tax or an attorney occupation fee)." BLACK'S LAW DICTIONARY 605 (8th ed.2004).

*History of the Property Tax in America, in* PROPERTY TAXA-
TION AND LOCAL GOVERNMENT FINANCE 127 (Wallace E. Oates
ed.2001); *see also* John A. Miller, *Rationalizing Injustice:
The Supreme Court and the Property Tax,* 22 HOFSTRA L.REV.
79, 83 n. 8 (1993) (describing origin of property tax in United
States). While its primacy has faded with the implementation
of local income taxes and sales taxes, the property tax has
remained a primary provider of local tax revenues for, among
other things, public schools, police and fire departments, and
sanitation services. Wallis, *supra,* at 127–28; Miller, *supra,* at
83 n. 8; Stewart E. Sterk & Mitchell L. Engler, *Property Tax
Reassessment: Who Needs It?,* 81 NOTRE DAME L.REV. 1037,
1037 (2006). For example, when the first comprehensive
census of governments was completed in 1902, property taxes
comprised 73% of all revenue collected by local governments.
In 1992, the percentage was 40. Wallis, *supra,* at 123.

■ Today in Pennsylvania, property taxation is primarily
used to raise revenue for the maintenance of the counties'
public school systems, and is administered through a number
of statutory provisions. *See Pennsylvanians Against Gam-
bling Expansion Fund, Inc. v. Commonwealth,* 583 Pa. 275,
877 A.2d 383, 413 (2005) (citing *Mikell v. Phila. Sch. Dist.,* 359
Pa. 113, 58 A.2d 339 (1948)). Relevant to the present appeal,
Pennsylvania's property assessment laws are governed by
both the General County Assessment Law, 72 P.S. §§ 5020–1
to–602, which contains provisions applying to all sixty-seven
counties, and by statutes applicable to specific categories of
counties, *e.g.,* first-class counties, second-class counties, *etc.*
Under this statutory regime, as with those preceding it, a
county conducts property assessments in order to value a
property and arrive at a basis for property taxation. Al-
though based on a property's "actual value," [5] the value estab-

5. Actual value is a property's fair market value, and "is defined as the
price a purchaser, willing but not obliged to buy, would pay an owner,
willing but not obliged to sell, considering all uses to which the
property is adapted and might reasonably be applied." *Downingtown
Area Sch. Dist. v. Chester County Bd. of Assessment,* 590 Pa. 459, 913
A.2d 194, 196 n. 2 (2006); *accord Green v. Schuylkill County Bd. of
Assessment Appeals,* 565 Pa. 185, 772 A.2d 419, 425 n. 6 (2001).

lished by the tax assessors is referred to as a property's "assessed value." *See* BLACK'S LAW DICTIONARY 1586 (8th ed.2004) (defining assessed valuation as "[t]he value that a taxing authority gives to property and to which the tax rate is applied").[6] Under the Uniformity Clause, countywide assessments must be uniform so that all property in each county is uniformly assessed. *See* PA. CONST. art. VIII, § 1. Such uniformity is more easily achievable in counties where all real property is assessed at 100 percent of market value, resulting in assessed values that are the same as actual values. Disparities in uniformity often occur where a property is assessed at a higher percentage of fair market value than other properties in the taxing district, causing assessed values and actual, fair market values to differ, often dramatically.

Prior to 1982, Pennsylvania's assessment laws required that each county assess real property every year based on its current fair market value—no doubt in order to avoid the disparity described above. Allegheny County was the only county then permitted to conduct triennial assessments. In practice, however, most counties did not comply with the annual assessment requirement. In 1982, the assessment laws governing the different counties were amended so as to allow counties to utilize either a current market value method or to adopt a base year market value method in arriving at the

6. In *Breslow v. School District of Baldwin Township*, 408 Pa. 121, 182 A.2d 501 (1962), this Court described assessed value as follows:

> It is a matter of common knowledge that in nearly every township, county and city in Pennsylvania, property is assessed for tax purposes lower than its market value. The assessed value of taxable property for tax purposes usually varies between 15 and 70 per cent of its actual market value. To the people and voters of Pennsylvania, the words "assessed value" have a plain common popular meaning. They are almost universally understood in their common popular sense or meaning to mean just what they say-the value at which they are assessed by the taxing authorities and not their market value. Furthermore, if one or more parcels of real estate or buildings are assessed at their market value—based upon a sale by a willing seller to a willing purchaser—and the other taxable properties are assessed on an "assessed value" which is lower than market value, the Uniformity [C]lause of the Constitution requires the assessed value to prevail.

*Id.* at 504 (citation omitted).

assessed value of each property in the county. 72 P.S. § 5020–402. A "base year" is defined as:

> [t]he year upon which real property market values are based for the most recent countywide revision of assessment of real property or other prior year upon which the market value of all real property of the county is based. Real property market values shall be equalized within the county and any changes by the board of assessment appeals shall be expressed in terms of such base year values.

72 P.S. §§ 5020–102, 5342.1.

Under a base year system of valuation, a county performs a countywide reassessment of all real property in the base year, and then uses each property's base year assessment as that property's basis for taxation in the base year, as well as its basis (*i.e.*, assessed value) in subsequent years. *Downingtown Area Sch. Dist. v. Chester County Bd. of Assessment Appeals*, 590 Pa. 459, 913 A.2d 194, 202–03 (2006). In the base year, a property's assessed value may be 100% of its actual value, and thus, assessments of all real estate in the county are based on actual, fair market value for the base year. Each year thereafter, however, a given property's market value may change, but its assessment ordinarily remains static, fixed at its base year level until the next countywide reassessment. *Id.* at 203–04. This is so because a county utilizing a base year method of valuation typically does not consider market fluctuations subsequent to the base year when assessing "current value," or factor in variables such as improvements to a property that may increase its assessed value. If a building is constructed on a lot that was vacant during the base year, the property's assessed value is determined by using either sales of comparable properties in the base year or base year construction schedules.[7]

---

7. As described in *Downingtown:*

   [B]ecause of the discrepancy between present-year dollars and base-year dollars, when a county board of assessment appeals alters the value associated with a particular piece of property, *see* 72 P.S. § 5347.1 (listing permissible bases for a board-initiated alteration in assessed value), the board designates the new value in terms of base year dollars. *See generally* 72 P.S. § 5342.1 (defining "base year"

The present litigation is the latest in a long line of cases challenging Allegheny County's method of property assessment. Prior to 2002, Allegheny County did not use a base year for calculating assessments. In the 1980s and 1990s, the County purportedly assessed property at its actual value in the current taxable year, but, in fact, did not conduct annual countywide reassessments. Instead, the County used a property's assessed value from the prior year when assessing value in the current year, sometimes with a slight increase in neighborhoods where property values were increasing, and a slight decrease in neighborhoods where values were perceived as declining. Periodically, an entire area was reassessed, though the area may only have comprised a portion of a school district. When such a reassessment occurred, the reassessed property owners were paying more taxes proportionately than owners of properties in the school district that were not reassessed. Trial Ct. Op. at 2–3.

On January 1, 1996, a newly elected Board of County Commissioners in Allegheny County adopted a resolution freezing assessments except for physical changes to a proper-

and stating that "[r]eal property values shall be equalized within the county and any changes by the board of assessment appeals shall be expressed in terms of such base year values"); *accord* 72 P.S. § 5020–402 (requiring that selling price, estimated or actual, "shall be subject to revision by increase or decrease to accomplish equalization with other similar property within the taxing district"). For example, if a home is replaced on a lot, the parcel's value may increase from (say) $100,000 to $200,000 in present-year dollars due to the new construction. However, the board does not simply reassess the property at $200,000; rather, using tables, charts, and other accepted techniques, the board determines what the improved property would have been worth in the base year—in this example, perhaps $180,000; it is this latter figure of $180,000, multiplied by the base year [established predetermined ratio], which becomes the parcel's new assessed value for the present tax year. In this way, uniformity is maintained because, as explained above, other properties whose assessments have not been altered also remain assessed according to base year dollars. *See generally* [*City of Lancaster v. County of Lancaster*, 143 Pa.Cmwlth. 476, 599 A.2d 289, 295–96 (1991)] (holding that a county that uses base year market values for most of the county may not, consistent with the Uniformity Clause, utilize a formula based upon current market value as to a selected group of taxing districts only).
913 A.2d at 203–04.

ty. The next day, the Allegheny County Board of Property Assessment, Appeals and Review ("Assessment Board")—which, under the Second Class County Assessment Law, is responsible for establishing assessments—adopted a resolution freezing assessments, with the exception of new buildings, construction, improvements, and subdivisions. A year later, in January 1997, the Assessment Board extended the freeze to the 1997 tax year, intending the freeze to remain in effect for five years, or until such time when a countywide reassessment was conducted. Trial Ct. Op. at 3.

Allegheny County property owners brought a lawsuit challenging the assessment freeze, and Judge Wettick ruled that the freeze violated the Second Class County Code, 16 P.S. §§ 3101–5106–A, which imposes an obligation on the Assessment Board to revise and equalize assessments on an annual basis. *Miller v. Bd. of Property Assessment, Appeals & Review of Allegheny County*, 145 P.L.J. 501 (Pa. Com. Pl. Allegheny 1997).[8] Judge Wettick's order directed the Assessment Board to make appropriate adjustments and revisions during 1997 for the 1998 tax year. Thereafter, the Assessment Board and the County informed Judge Wettick that the assessment system could not be repaired. At the County's request, Judge Wettick entered a consented-to court order modifying his prior orders setting timetables for making adjustments and modifications, and ordering that a comprehensive countywide assessment be completed by 2000 for use in the 2001 tax year. Trial Ct. Op. at 3–4.

In 2000, Allegheny County became a home-rule entity and the County's new legislative branch, the County Council, adopted a comprehensive ordinance to govern assessments, which required, among other things, annual reassessments. *See* 302 Pa.Code §§ 1.1–101 to 51.24–2411. The assessment ordered by Judge Wettick was completed and used for the 2001 tax year, though several lawsuits were filed alleging that the new assessments were invalid because they had not been

8. At the time of Judge Wettick's 1997 decision, neither the Assessment Board nor the County claimed that Allegheny County used a base year method of property assessment. Trial Ct. Op. at 3 n. 4.

properly certified, and approximately 90,000 taxpayers filed appeals with the Board of Assessments contesting their 2001 valuations. Trial Ct. Op. at 3–4.

Thereafter, pursuant to the Allegheny County Administrative Code's requirement of annual reassessments, the County Assessment Office performed an annual reassessment for use in tax year 2002.[9] In 2002, however, the Allegheny County Assessment Ordinance was amended to provide that the 2002 assessment would serve as the base year for years 2003, 2004, and 2005, and provided that the assessments for 2006 would be completed and provided to property owners, with an immediate right of appeal. Thus, in early 2005, the County's Chief Assessment Officer completed a computer-assisted reassessment for use in the 2006 tax year. Pursuant to the County Administrative Code, the Chief Assessment Officer obtained independent verification that the reassessment met the standards of the International Association of Assessing Officers ("IAAO") and presented the reassessment to County officials. The 2005 assessment, however, was never formally certified by County officials. Trial Ct. Op. at 4.

On March 15, 2005, the County Council enacted Ordinance 15, which provided for the Chief Assessment Officer to: (1) determine the actual value of each property; (2) perform an analysis of the increase or decrease in valuations in different

9. Section 5–209.10 of the Allegheny County Administrative Code states that:

> The Chief Executive shall, after considering the recommendations of the Property Assessment Oversight Board and of the Chief Assessment Officer, present to County Council a proposed ordinance for adoption that shall:
> A. Set forth a methodology for the valuation of properties for taxation purposes;
> * * * *
> C. Require an annual reassessment through a professionally developed and maintained Computer Assisted Mass Appraisal system (CAMA);
> D. Require that the annual reassessment be applied to all properties, including tax exempt property, public utility property, and residential trailers;
> * * * *

Allegheny County Administrative Code § 5–209.10; *see also Beattie v. Allegheny County*, 589 Pa. 113, 907 A.2d 519, 528 (2006).

neighborhoods; and (3) assign a specific value limitation for each neighborhood-either decrease, no change, one percent, two percent, three percent, or four percent. Thus, under Ordinance 15, the assessed value of a property could not increase by more than four percent.[10] Taxpayers challenged the validity of Ordinance 15, and in *Sto–Rox School District v. Allegheny County*, 153 P.L.J. 193 (Pa. Com. Pl. Allegheny 2005), Judge Wettick found that Ordinance 15 improperly required the Chief Assessment Officer to determine the taxable values of certain properties by reducing their actual values by different percentages. Judge Wettick ruled that Ordinance 15 violated the Home Rule Charter of Allegheny County, the Second Class County Charter Law, Pennsylvania's laws governing property assessments, and the Uniformity Clause of the Pennsylvania Constitution. However, because the uncertified 2005 assessment was subject to lingering questions and criticism, Judge Wettick denied the plaintiffs' request to direct that the 2005 assessment be certified for use in the 2006 tax year. Trial Ct. Op. at 5.

On October 18, 2005, County Council enacted Ordinance 45, which amended the County Administrative Code to provide for the continued use of the 2002 assessment as a base year. Thus, assessments for 2006 and subsequent years would be based on a property's value as of 2002. Ordinance 45 did not set forth any date by which a reassessment should be completed, though it required that, in 2009, a qualified expert conduct a detailed study of the existing property assessment system in Allegheny County. Ordinance 45 also removed the County Administrative Code's requirement that the Chief Assessment Officer complete ratio studies to determine whether the assessed values met IAAO uniformity and equality standards. Trial Ct. Op. at 6.

## II. Present Litigation

The present litigation arises out of two lawsuits challenging the validity of Ordinance 45: one filed by appellees Kenneth

10. It is unclear whether there was also a four-percent limitation for decreasing property values.

Pierce and Stephanie Beechaum ("the Pierce complaint"), and another by appellees James C. Clifton, Charles and Lorrie Cranor (husband and wife), and Roy Simmons and Mary Lisa Meier (husband and wife) ("the Clifton complaint").[11] The individual complaints were based on the following facts.

The Pierce property, located in Braddock, was assessed by the County at $27,900 in 2002. Under Ordinance 45, the property will continue to be assessed at that value indefinitely, unless challenged through appeal. The uncertified value of the property for tax year 2006, based on the 2005 uncertified reassessment, was listed at $14,200 on the County's Real Estate Website. The trial court found this value to be far closer to the property's actual value and concluded that the property was over-assessed. Trial Ct. Op. at 6.

The Beechaum property, located in the Hill District of Pittsburgh, was assessed at $29,000 based on the 2002 base year assessment. The uncertified value of the property based on the 2005 reassessment was $15,500. The trial court also found that this value was far closer to the property's actual value and concluded that the property was over-assessed. *Id.* at 7.

The Clifton property is located in Wexford and was purchased by Clifton for $532,000 on June 11, 2004. The 2004, 2005, and 2006 assessed values of the property were $508,000, though its 2002 assessed value was $425,400. *Id.*[12]

The Cranor property is located in Pittsburgh and was purchased on December 8, 2003 for $730,000. In 2005 and 2006, its value was assessed at $730,000. In 2002 and 2003, it was assessed at $466,000. *Id.*

11. The Clifton complaint named Allegheny County as defendant, while the Pierce complaint named Allegheny County, Chief Executive of Allegheny County Daniel Onorato, and Chief Assessment Officer of Allegheny County Deborah Bunn as defendants. We will refer to defendants/appellants collectively as "Allegheny County" or "the County."

12. The 2002 values of the properties described in the Clifton complaint were increased following appeals taken by the taxing bodies, and not because of actions taken by the Board of Property Assessments.

The Meier–Simmons property in Mt. Lebanon was purchased on April 6, 2004 for $412,500. The property's 2005 and 2006 assessed value was $412,500, though it was assessed for $233,700 in 2002 and 2004. *Id.* at 7–8.[13]

Appellees initially challenged the legality of Ordinance 45 and sought a court order that would: (1) declare that the use of 2002 property values as the fair market values of properties for the 2006 tax year violated state assessment laws; and (2) direct the Chief Assessment Officer to certify the 2006 assessment values based on the 2005 reassessment.[14] Although the original complaints referred to violations of the Uniformity Clause of the Pennsylvania Constitution, the focus of the complaints was whether Pennsylvania assessment laws permitted Allegheny County to use 2002 actual values (the base year values) for a 2006 assessment.[15]

The County filed preliminary objections seeking dismissal for failure to state grounds for relief. The trial court sustained the County's preliminary objections that sought the dismissal of the claims alleging that Ordinance 45 violates state assessment laws. The trial court rejected appellees' argument that provisions of the assessment laws that permit-

13. The 2006 assessed values of the properties in the Clifton complaint were reduced by $15,000 for purposes of the real estate tax imposed by Allegheny County because of a County homestead exemption. Trial Ct. Op. at 7. Like the trial court, we will only address full market values in this Opinion.

14. The Clifton plaintiffs claimed that adoption of the base year scheme utilizing the 2002 base year values unfairly benefits owners who purchased their properties prior to 2002, at the expense of owners, like themselves, who purchased their properties or built homes subsequent to 2002 because the latter are required to appeal their assessed values in order to have the values "rolled back" to the 2002 fair market value. Clifton Complaint at 12. Thus, averred the Clifton plaintiffs, the County forces recent homebuyers to "appeal their way to uniformity." *Id.*

15. The Township of Upper St. Clair and the Upper St. Clair School District intervened in the proceedings and alleged that since 2002 they have, through the appeal process, increased the assessed value of numerous properties based on post–2002 sales prices. The Township and School District contended that the County cannot use 2002 base year values because those values include assessment appeal valuations based on sales occurring after 2002. The taxing bodies urged the trial court to adopt a 2005 base year.

ted a county to adopt a base year value method of assessment were intended only to permit a county to express current values as base year values. The court concluded that the plain language of the assessment laws permitted assessments in future years to be based on actual values in the base year.[16] In any event, the trial court permitted appellees to file amended complaints raising constitutional challenges to the state assessment laws. Thereafter, appellees filed amended complaints in both lawsuits, alleging that Pennsylvania's base year method for assessing property values violates the Uniformity Clause of the Pennsylvania Constitution. Answers were filed and a nonjury trial was held on December 11, 13, and 14, 2006.

After thorough consideration of the history of the uniformity requirement in real estate taxation in Pennsylvania, as well as the assessment procedures of other states, the trial court determined that the provisions of the General County Assessment Law and the Second Class County Assessment Law, which allow a county to arrive at actual value through use of a base year method, violate the Uniformity Clause. Specifically, the trial court found that Section 502–402(a) of the General County Assessment Law, 72 P.S. § 5020–402(a), and Section 5452.4(a.2) of the Second Class County Assessment Law, 72 P.S. § 5452.4(a.2) violate the Uniformity Clause. The trial court found that the base year method of assessment is invalid on its face because it inevitably produces arbitrary, unjust, and unreasonably discriminatory results. The court also found that, in most counties, base year assessments have, in fact, produced substantial levels of inequities in the ratio of assessed values to market values, which could easily be reduced through periodic reassessments.

The trial court faulted the base year system, as employed in Allegheny County, for failing to consider market fluctuations

16. The trial court noted that, although pursuant to its earlier decision in *Miller, supra,* a county may not operate an assessment system that purportedly utilizes current market valuation while freezing assessment, a county may achieve the same result through use of a base year method of valuation. Although recognizing that this scheme may elevate form over substance, the trial court found that such a result was permitted by Pennsylvania's assessment law.

between the 2002 base year and the current tax year. To illustrate, the trial court offered the following example: the Woodland Hills School District, which includes Edgewood and Braddock, used 2002 fair market values to calculate the 2007 school taxes paid by property owners even though overall property values in Edgewood increased by 35.87% between 2002 and 2005, while property values in Braddock declined by 16.09%. Trial Ct. Op. at i (opinion summary). In conclusion, the trial court determined that assessment laws allowing use of a base year assessment without requiring reassessments violate the Uniformity Clause because:

(1) base year assessments are not intended to assess all properties at the same percentage of assessed value to actual value, (2) base year assessments inherently cause significant disparities in the ratio of assessed value to fair market value, and (3) base year assessments inevitably discriminate against owners of properties in lower-value neighborhoods.

*Id.* at iv (opinion summary).

The trial court recognized that, given its ruling that the base year system of property assessment is unconstitutional, "the only remaining option for Allegheny County under [the] General County Assessment Law is an annual reassessment based on the current market value." Trial Ct. Op. at 91. Aware of the statewide implications of its decision, however, the trial court did not follow appellees' recommendation and compel a reassessment for the 2008 tax year, stating that:

For two reasons, I am not entering a court order directing Allegheny County to complete a reassessment (similar to the 2005 reassessment) in 2007 for use in 2008.

First, .... [m]y ruling concerns a statewide rather than an Allegheny County issue because Allegheny County's use of a 2002 base year is permitted under the state assessment laws and every county in the state uses a base year method of assessment. Allegheny County's assessments are more uniform than the assessments of most other counties. Under these circumstances, the interests of justice are served by permitting Allegheny County to continue to assess prop-

erty in the same manner as all other counties assess property during the pendency of an appeal of my ruling to the Pennsylvania [ ] Supreme Court as opposed to imposing reassessment requirements on Allegheny County that are not imposed on any other county.

Second, only the General Assembly can develop a comprehensive system of assessing property that considers the approaches of the different states.

*   *   *   *   *   *

This litigation does not involve legislation that the current members of the General Assembly enacted. The current members of the General Assembly should have an opportunity to respond to this litigation by considering whether to address the issues of the absence of an oversight body, the failure of the counties to reassess, and assessments that do not meet any recognized uniformity and equality standards.

Trial Ct. Op. at 91–92 (citations and footnotes omitted). Instead, the trial court's order directed the Chief Assessment Officer of Allegheny County to complete, by March 31, 2008, "a computer-assisted reassessment for use in 2009 similar to the reassessment she prepared in February 2005 for use in 2006," and to obtain independent verification that the reassessment meets IAAO standards. The order directed the reassessment to be completed prior to October 31, 2008 if all proceedings pending in Pennsylvania courts were concluded by then. If a final order had not been entered by October 31, 2008, the order directed that, by March 31, 2009, the Chief Assessment Officer shall complete a computer-assisted reassessment for use in 2010, and obtain independent verification that the reassessment meets IAAO standards.

On June 17, 2007, Allegheny County filed a motion for post-trial relief, challenging the trial court's order on fifteen separate grounds and claiming that it should be vacated. Appellees filed a motion for post-trial relief seeking immediate implementation of the trial court's directive to reassess properties in Allegheny County. Following oral argument on both motions, the trial court dismissed each motion and entered

final judgment in each case. Thereafter, the County filed the instant consolidated direct appeal.[17]

The County makes three claims on appeal: (1) that Pennsylvania assessment laws permitting use of a base year method of valuation are not unconstitutional because they are rationally related to the legitimate government interest in having a stable and predictable property tax assessment; (2) that the Uniformity Clause was not violated in this case because a common standard, or same ratio, was applied to all properties; and (3) that, in its decision, the trial court improperly relied on IAAO standards. In short, the County claims that "the use of a base year assessment system in Allegheny County has not resulted in such pervasive countywide inequities to render the entire assessment system non-uniform in application and to require the performance of two consecutive reassessments." County's Brief at 27.

## III. Discussion

First appearing in Pennsylvania's 1874 Constitution, the Uniformity Clause prescribes that "[a]ll taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and

---

**17.** This Court has exclusive jurisdiction over appeals from final orders of the courts of common pleas holding a statute unconstitutional. 42 Pa.C.S. § 722(7) ("The Supreme Court shall have exclusive jurisdiction of appeals from final orders of the courts of common pleas in ... [m]atters where the court of common pleas has held invalid as repugnant to the Constitution, treaties or laws of the United States, or to the Constitution of this Commonwealth, any treaty or law of the United States or any provision of the Constitution of, or of any statute of, this Commonwealth, or any provision of any home rule charter."). Because the issue presented is a question of law, our scope of review is plenary and our standard of review is *de novo*. *Castellani v. Scranton Times, L.P.*, 598 Pa. 283, 956 A.2d 937, 943 (2008). Although not addressed by the parties, we preliminarily note that the trial court properly exercised equity jurisdiction over the present matter (rather than dismissing appellees' complaints for failure to exhaust the administrative process), because appellees' claim that the base year system results in mass, systematic, non-uniform assessments raises substantial constitutional issues, which a county board of assessment appeals would be unable to adequately redress. *See Beattie v. Allegheny County*, 589 Pa. 113, 907 A.2d 519, 524–25, 527 (2006); *Borough of Green Tree v. Bd. of Property Assessments, Appeals & Review of Allegheny County*, 459 Pa. 268, 328 A.2d 819, 825 (1974).

collected under general laws." Pa. Const. art. VIII, § 1.[18] In 1909, this Court described the constitutional requirement of uniformity in taxation as follows:

> In Pennsylvania the framers of the new Constitution embodied this principle in our organic law in terms so plain that no one should misunderstand its meaning or doubt its application, and the people by the adoption of that instrument placed the seal of their approval upon a system of taxation which has for its corner stone uniformity in the valuation, levy, and collection of all taxes. [The Uniformity Clause] provides that: "All taxes shall be uniform upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." There is, perhaps, no other section of the Constitution upon which the courts above and below have been so frequently required to pass in the administration of their duties. The central thought running through all the opinions is that the principle of uniformity is a constitutional mandate to the courts, to the Legislature, and to the taxing authorities, in the levy and assessment of taxes which cannot be disregarded. The purpose of requiring all tax laws to be uniform is to produce equality of taxation. Absolute equality is difficult of attainment, and approximate equality is all that can reasonably be expected. Hence it has been held that where there is substantial uniformity the constitutional requirement has been met. But all these cases hold there must be substantial uniformity, which means as nearly uniform as practicable in view of the instrumentalities with which and subjects upon which tax laws operate. It is the duty of the courts in dealing with this subject to enforce as nearly as may be equality of burden and uniformity of method in determining what share of the burden each taxable subject must bear.

*Delaware, L. & W.R. Co.'s Tax Assessment*, 224 Pa. 240, 73 A. 429, 430 (1909) (internal citation omitted).

18. In the 1968 Constitution, the Uniformity Clause was renumbered from former Article IX, Section 1, though the language of the clause has not been changed since it was first adopted in 1874.

■ Taxation, however, is not a matter of exact science; hence absolute equality and perfect uniformity are not required to satisfy the constitutional uniformity requirement. *Leonard v. Thornburgh*, 507 Pa. 317, 489 A.2d 1349, 1352 (1985); *see also In re Harleigh Realty Co.*, 299 Pa. 385, 149 A. 653, 654 (1930) ("Scientific formulae, arithmetical deductions and mental contemplations, have small value in making assessments under our practical system of taxation.") (internal quotations omitted). Some practical inequalities are obviously anticipated, and so long as the taxing scheme does not impose substantially unequal tax burdens, rough uniformity with a limited amount of variation is permitted. *Beattie v. Allegheny County*, 589 Pa. 113, 907 A.2d 519, 530 (2006) (citing *Leonard*, 489 A.2d at 1352; *Sablosky v. Messner*, 372 Pa. 47, 92 A.2d 411, 416 (1952)).

■ When a taxpayer believes that he has been subjected to unequal taxation due to an allegedly unconstitutional statute, he generally must demonstrate that: (1) the enactment results in some form of classification; and (2) such classification is unreasonable and not rationally related to any legitimate state purpose. *Wilson Partners, L.P. v. Bd. of Fin. & Revenue*, 558 Pa. 462, 737 A.2d 1215, 1220 (1999).[19] When considering such a challenge, reviewing courts must remain cognizant of the General Assembly's broad authority and wide discretion in matters of taxation, *id.*, and the presumption that, when enacting any statute, the Legislature does not

19. An implicit part of the General Assembly's broad legislative authority to enact health, safety, and community welfare regulation is the power to classify. *Harrisburg Sch. Dist. v. Zogby*, 574 Pa. 121, 828 A.2d 1079, 1088 (2003). Classifications that are "suspect" or "sensitive," or that implicate fundamental or important rights are subjected to heighted judicial scrutiny. *Commonwealth v. Albert*, 563 Pa. 133, 758 A.2d 1149, 1152 (2000). In the absence of such interests, classifications are subject to the deferential rational basis test. *Id.* Under the rational basis standard, as long as a classification bears a reasonable relationship to a legitimate state interest, even though discriminatory, it "will be deemed reasonable if any state of facts reasonably can be conceived to sustain it," and will only be struck down "if it is based upon artificial or irrelevant distinctions used for the purpose of evading the constitutional prohibition." *Id.* (citing *Curtis v. Kline*, 542 Pa. 249, 666 A.2d 265, 267 (1995); *Harrisburg Sch. Dist. v. Hickok*, 563 Pa. 391, 761 A.2d 1132, 1136 (2000)).

intend to violate the Constitutions of the United States or of this Commonwealth, 1 Pa.C.S. § 1922(3). Accordingly, a tax enactment will not be invalidated unless it "clearly, palpably, and plainly violates the Constitution." *Wilson Partners*, 737 A.2d at 1220 (quoting *Leonard*, 489 A.2d at 1351–52) (internal quotation marks omitted).

Judicial review of allegedly unconstitutional tax legislation thus generally focuses on whether there is "some concrete justification for treating the relevant group of taxpayers as members of distinguishable classes subject to different tax burdens." *Leonard*, 489 A.2d at 1352 (internal quotation marks omitted); *see also Columbia Gas Corp. v. Commonwealth*, 468 Pa. 145, 360 A.2d 592, 595 (1976). While reasonable and practical classifications in tax legislation are justifiable and often permissible, when a method or formula for computing a tax will, in its operation or effect, produce arbitrary, unjust, or unreasonably discriminatory results, the uniformity requirement is violated. *Allegheny County v. Monzo*, 509 Pa. 26, 500 A.2d 1096, 1104 (1985); *accord Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County, W. Va.*, 488 U.S. 336, 345, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989) ("[I]ntentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property.") (alteration in original and internal quotation marks omitted).[20]

Property taxation, however, is different. With property taxation, real property is the classification. *McKnight Shopping Ctr. v. Bd. of Property Assessment, Appeals & Review*, 417 Pa. 234, 209 A.2d 389, 392 (1965). Although there is no express constitutional requirement that real property be treated as a single class, this Court has

20. Our analysis under the Uniformity Clause of the Pennsylvania Constitution is generally the same as the analysis under the Equal Protection Clause of the United States Constitution. *Wilson Partners*, 737 A.2d at 1220; *Tool Sales & Serv. Co. v. Commonwealth*, 536 Pa. 10, 637 A.2d 607, 614 (1993); *Leventhal v. City of Philadelphia*, 518 Pa. 233, 542 A.2d 1328, 1331 (1988).

consistently interpreted the uniformity requirement of the Pennsylvania Constitution as requiring all real estate to be treated as a single class entitled to uniform treatment. *See, e.g., Westinghouse Elec. Corp. v. Bd. of Property Assessment, Appeals & Review of Allegheny County,* 539 Pa. 453, 652 A.2d 1306, 1314 (1995); *Deitch Co. v. Allegheny Bd. of Property Assessment,* 417 Pa. 213, 209 A.2d 397, 402 (1965); *McKnight,* 209 A.2d at 392.[21] Such an interpretation is in keeping with the overarching concept that, in property taxation, the uniformity requirement is based on "the general principle that taxpayers should pay no more or less than their proportionate share of government." *Downingtown,* 913 A.2d at 199. In *Westinghouse Electric,* this Court stated that:

> [The Uniformity Clause] requires that all taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax. **This means that all real estate is a constitutionally designated class entitled to uniform treatment and the ratio of assessed value to market value adopted by the taxing authority must be applied equally and uniformly to all real estate within the taxing authority's jurisdiction.**

652 A.2d at 1314 (emphasis added); *see also Keebler Co. v. Bd. of Revision of Taxes of Phila.,* 496 Pa. 140, 436 A.2d 583, 584 (1981) ("[A]ll real estate is a class which is entitled to uniform treatment.").[22]

**21.** Although the analysis under the federal Equal Protection Clause and Pennsylvania's Uniformity Clause is largely coterminous, unlike Pennsylvania's uniformity requirement, "the United States Constitution does not require equalization across all potential sub-classifications of real property (for example, residential versus commercial)." *Downingtown,* 913 A.2d at 201 n. 9 (citing *Allegheny Pittsburgh Coal,* 488 U.S. at 344, 109 S.Ct. 633).

**22.** Additionally, in *McKnight,* this Court described the uniformity requirement as follows:

> In applying this provision of our Constitution to the taxation of the real estate, it is clear that all real estate is the class entitled to uniform treatment and that the ratio of assessed value to market value adopted by the taxing authority—be it 20%, 60% or 100%[ ]— must be applied equally and uniformly to all real estate within the jurisdiction of such authority. This does not mean that different factors may not be employed in arriving at market values for one type

Previously, this Court had suggested an absolutist approach when describing the uniformity requirement, holding that "real estate as a subject for taxation may not validly be divided into different classes." *In re Lower Merion Twp.*, 427 Pa. 138, 233 A.2d 273, 276 (1967). Although we have consistently recognized that the Uniformity Clause precludes "real property from being divided into different classes for purposes of systemic property tax assessment," we have since retreated from such an absolutist approach. *See Downingtown,* 913 A.2d at 200. In *Downingtown,* we stated that the general uniformity requirement does not eliminate "any opportunity or need to consider meaningful sub-classifications as a component of the overall evaluation of uniform treatment in the application of the taxation scheme." *Id.* In so stating, however, this Court was primarily concerned with overall uniformity, and we reaffirmed "the prevailing requirement that similarly situated taxpayers should not be deliberately treated differently by taxing authorities." *Id.* at 201 ("[W]hile the Commonwealth may certainly seek to achieve overall uniformity by attempting to standardize treatment among differently situated property owners, its efforts in this regard do not shield it from the prevailing requirement that similarly situated taxpayers should not be deliberately treated differently by taxing authorities.").

■■■ In any event, judicial review of uniformity challenges to a statutory scheme of property taxation often needs only to focus on the first prong of the uniformity analysis—whether the statute results in a "classification"—because in the property taxation context, any disparity in tax liability, beyond the expected practical inequities, most likely constitutes a violation

of real estate when contrasted with another type of real estate. Certainly, the factors which affect the market value of a parcel of commercial property may differ from those which affect the market value of a residence. However, once the relevant factors are applied and market values are determined, the ratio of the assessed values to these market values must be uniform throughout the taxing district. Thus, in determining uniformity the ratios of assessed values to market values of all properties are all relevant, and hence, in that sense all properties are "comparables."

209    A.2d at 392–93 (internal citations and footnotes omitted).

of the Uniformity Clause. In essence, such a challenge resembles a taxpayer's claim before a county board of assessment appeals that his property was assessed at a higher percentage of fair market value than other properties throughout the same taxing district. *See Downingtown*, 913 A.2d at 199 ("[A] taxpayer is entitled to relief under the Uniformity Clause where his property is assessed at a higher percentage of fair market value than other properties throughout the taxing district.").[23] In the present case, where appellees claimed that Allegheny County's base year method of valuation violated the Uniformity Clause, the burden is essentially the same: the taxpayer must demonstrate a lack of uniformity in assessments, whether the result of a single, isolated misassessment of his own property or the result of a statutory scheme of valuation causing mass misassessment.

Before determining whether a base year method of valuation produces the type of misassessment that violates the Uniformity Clause, we must consider the constitutional contours of real property valuation, as well as how a lack of uniformity is demonstrated. Preliminarily, the Pennsylvania Constitution requires that property valuations be based, as nearly as practicable, on the relative value of each property to

23. A taxpayer who believes that his property has been inequitably assessed may appeal the assessment to the county board of assessment appeals. *See* 72 P.S. § 5020–511; *see, e.g., Green v. Schuylkill County Bd. of Assessment Appeals*, 565 Pa. 185, 772 A.2d 419, 425 (2001); *Westinghouse*, 652 A.2d at 1308. The board's decision is then appealable to the court of common pleas for a trial *de novo.* 72 P.S. § 5020–518.1; *see also Downingtown*, 913 A.2d at 195–96; *Green*, 772 A.2d at 425; *Westinghouse*, 652 A.2d at 1308. In assessment appeals, all properties in the relevant taxing district are comparable for purposes of establishing the appropriate ratio of assessed value to market value in a uniformity challenge, though the parties and the trial court should rely upon evidence of assessment-to-value ratios of similar properties. *Downingtown*, 913 A.2d at 199.

In addition to taxpayers, corporate authorities of any municipality may appeal a property's assessment. 72 P.S. § 5020–520. For example, school districts often appeal, some more aggressively than others, the assessments of properties that they believe are under-assessed. *See, e.g., Downingtown*, 913 A.2d at 196; *In re Penn–Delco Sch. Dist.*, 903 A.2d 600, 603 (Pa.Cmwlth.2006); *Vees v. Carbon County Bd. of Assessment Appeals*, 867 A.2d 742, 744 (Pa.Cmwlth.2005); *In re Springfield Sch. Dist.*, 879 A.2d 335, 336 (Pa.Cmwlth.2005).

market value. *Delaware, L. & W. R. Co.'s Tax Assessment,* 73 A. at 430. In *Delaware, L. & W.R.,* this Court described how real property taxation satisfies the uniformity requirement through a system of equitable valuation:

> Each person, natural or artificial, must bear his share of the public burdens, and the burden of each is measured by the ratio ascertained by dividing the total amount of taxes necessary to meet the public burdens in a given district by the whole valuation of property within the territorial limits of that district, and, when the ratio is thus fixed, the amount of tax to be paid by each individual property owner is determined by multiplying the assessed value of his property by this ratio. This rule has resulted from the demands made by the people upon legislative bodies for equality of taxation. The large property owner and the small holder pay upon the same ratio, and when the valuation has been ascertained and fixed upon a fair basis, which means that the valuation should be based as nearly as practicable upon market value, and, if not on market value, then upon the relative value of each property to market value, there results what is known in organic and statute law as uniformity, which is the desideratum to be attained in any just system of taxation. While every tax is a burden, it is more cheerfully borne when the citizen feels that he is only required to bear his proportionate share of that burden measured by the value of his property to that of his neighbor. This is not an idle thought in the mind of the taxpayer, nor is it a mere speculative theory advocated by learned writers on the subject; but it is a fundamental principle written into the Constitutions and statutes of almost every state in this country.

*Id.* (internal citation omitted). Accordingly, "[e]ach property should be assessed at its fair market value; it cannot be assessed at more than its fair market value or higher than the percentage of value uniformly fixed throughout the taxing district, nor can there be an intentional or systematic undervaluation of like or similar properties." *In re Brooks Bldg.,* 391 Pa. 94, 137 A.2d 273, 275 (1958); *see also Narehood v.*

*Pearson,* 374 Pa. 299, 96 A.2d 895, 899 (1953) ("The intentional, systematic undervaluation by state officials of taxable property of the same class belonging to other owners contravenes the constitutional right of one taxed upon the full value of his property.") (quoting *Cumberland Coal Co. v. Bd. of Revision of Tax Assessments in Greene County, Pa.,* 284 U.S. 23, 28, 52 S.Ct. 48, 76 L.Ed. 146 (1931) (emphasis and internal quotation marks omitted)).

■■■ Thus, in uniformity litigation, the aggrieved taxpayer must first establish the various valuations at issue, and then demonstrate how the disparate ratios of assessed-to-market value violate the uniformity requirement. A number of standards have been developed for measuring whether a system of property valuation produces sufficiently uniform results. The first such standard is the established predetermined ratio ("EPR"), which is set by a county's board of commissioners and is a ratio of assessed value to market value that must be uniformly applied in determining assessed value in a given year. 72 P.S. §§ 5020–102, 5342.1. For example, "the EPR in Allegheny County is 100. Thus, Allegheny County intends for a property's assessed value to be 100 of its actual value (using the 2002 base-year values). In application, however, the EPR is treated as a fixed number that merely fractionalizes assessments and which is generally held constant pending county-wide reassessment." *Downingtown,* 913 A.2d at 202–03 n. 13.[24] When a county utilizes a base year method of valuation, the EPR is used as follows:

24. In *Downingtown,* we discussed the EPR further:

The EPR is defined as the county's intended ratio of assessed value to market value for any given tax year, *see* 72 P.S. § 5342.1; BRIGHT, 27 SUMM. PA. JUR.2D TAXATION § 15:5, and thus, would appear to have been conceived as a methodology to advance equalization. Nevertheless, the statutory scheme otherwise requires equalization to be accomplished prior to the application of the EPR. *See* 72 P.S. §§ 5020–402 (requiring that "selling price, estimated or actual, shall be subject to revision by increase or decrease to accomplish equalization"), 5348(d) (same). With some justification, then, it appears that the latter provisions have been afforded precedence over the former, and, in practice, an EPR does not represent a true assessment by the county of the ratio of assessed value to market value (and which would thus vary annually where property values change but assess-

In the base year, the fair market value of all such properties is ascertained. Then, an EPR is applied to each such value to arrive at the base year assessment for every property in the county. To take a simple, but common, example, a county may set its base year EPR at 100% of actual value, and thus, reassess all real estate in the county at its actual value for the base year. Each year thereafter, until the next county-wide reassessment, a given property's value may change, but its assessment ordinarily remains static, fixed at its base year level.

*Id.* at 202–03 (footnote omitted).

The second standard involves the State Tax Equalization Boards ("STEB") determination of each county's common level ratio ("CLR"). The CLR is "the ratio of assessed value to current market value used generally in the county." 72 P.S. §§ 4656.16a, 5020–102, 5342.1.[25] The STEB calculates a county CLR based on sales information furnished by the county, as well as by independent appraisal data and other relevant information. *See Downingtown*, 913 A.2d at 200 n. 8.[26] As the trial court described, a county's CLR will be 70 if

> ments remain fixed, just as does the common level ratio). Rather, in application, the EPR is treated as a fixed number that merely fractionalizes assessments and which is generally held constant pending county-wide reassessments. *See* [Bert M. Goodman, Assessment Law & Procedure in Pennsylvania 258 (2002–2003 ed.)] (describing the EPR as "an arbitrary number selected by the government"); Bright, 27 Summ. Pa. Jur.2d Taxation § 15:12 ("It is unclear why Pennsylvania has institutionalized the practice of fractional assessment, since it does not appear to serve a useful purpose.").
>
> 913 A.2d at 202–03 n. 13 (some citations omitted).

25. The STEB, which was established in 1947 to combat the lack of statewide assessment uniformity, publishes annual assessment statistics for each of Pennsylvania's counties. *See* 72 P.S. § 4656.1 *et seq.*

26. Pursuant to Section 4656.16a of the Fiscal Code, a county CLR is established as follows:

> (a) The state Tax Equalization Board shall, annually, prior to July 1, establish for each county a common level ratio for the prior calendar year.
> (b) In arriving at such ratio, the board shall use statistically acceptable techniques, including sales ratio studies. The board's method in arriving at the ratio shall be made available to the public. The ratio shall be certified to the chief assessor of each county and it shall be

the total assessed value of properties sold in arms-length sales in a year is 70 of the total market value of the properties. Trial Ct. Op. at 17. Under normal economic conditions, however, a base year's CLR "tends to diminish each year, reflecting ongoing inflation and real estate appreciation." *Downingtown*, 913 A.2d at 203. Like the EPR, the CLR is not indicative of uniformity. For example, properties in a county with a CLR of 60 may be assessed at between 55 and 65 of their fair market value, which would not necessarily violate the Uniformity Clause because "some practical inequalities are anticipated, and rough uniformity with a limited amount of variation is permitted." *Beattie*, 907 A.2d at 530. However, a county with a CLR of 60% may also have assessed a number of properties at more than 90% of their fair market value, and a large number of others at less than 30% their fair market value. *See* Trial Ct. Op. at 18. In any event, the CLR is a useful tool for a taxpayer to demonstrate that his property has been over-assessed, as it allows him to compare the assessed-to-market value ratio of his property to the average ratio throughout the district.[27]

> admissible as evidence in any appeal involving real property tax assessments.
> (c) Any political subdivision or taxpayer aggrieved by any finding, conclusion or any method or technique of the board made pursuant to this section may, in writing, state objections thereto and may appeal de novo such ratio determination to the Commonwealth Court. After receiving any objections, the board may grant a hearing and may modify or adjust its findings and computations as it shall appear proper.
> 72 P.S. § 4656.16a; *see also Downingtown*, 913 A.2d at 203.

**27.** A county's EPR and CLR play an important role in assessment appeals. Currently, after appeal to the trial court, the court must determine the property's market value and the county's CLR, and then apply the county's EPR to the property's market value unless the corresponding CLR varies by more than 15% from the EPR, in which case the court shall apply the respective CLR to the corresponding market value of the property. 72 P.S. § 5020–518.2. However, it should be noted that, in *Downingtown*, we held a tax provision unconstitutional because it created an arbitrary classification of taxpayers who were forced to pay taxes on a higher-than-CLR ratio of assessed-to-actual value (so long as the CLR was at least 85% of the EPR), namely, those whose assessment the taxing body elected to challenge. 913 A.2d at 204–05.

Unlike the EPR and CLR, the coefficient of dispersion ("COD"), a third standard, is a widely accepted statistical indicator of uniformity in tax assessments. "The COD is the average deviation from the median, mean, or weighted mean ratio of assessed value to fair market value, expressed as a percentage of that figure." *Beattie*, 907 A.2d at 530 n. 7. "A high coefficient of dispersion indicates a high degree of variance with respect to the assessment ratios under consideration. A low coefficient of dispersion indicates a low degree of variance. In other words, a low coefficient of dispersion indicates that the parcels under consideration are being assessed at close to an equal rate." *Id.* (internal quotation marks and citations omitted). Referencing expert testimony, the trial court offered the following example: "[A] COD of 30 in a county with 100,000 parcels of taxable property means that the assessed values of approximately one-half of the properties in the county (*i.e.*, 50,000 properties) either exceed the common level ratio by 30% or are less than 30% of the common level ratio. In other words, close to 25,000 of the properties will be assessed at no more than 70% of the common level ratio while another 25,000 of the properties will be assessed at 130% or more of the common level ratio." Trial Ct. Op. at 19.

Finally, the price-related differential ("PRD") is a widely accepted indicator of inequity between high-value properties and low-value properties. "PRDs above 1.03 tend to indicate assessment regressivity (an appraisal bias in which high-value properties are appraised lower than low-value properties relative to their actual value), while PRDs below 0.98 indicate tax progressivity (an appraisal bias in which high-value properties are appraised higher than low-value properties relative to their actual value)." *Beattie*, 907 A.2d at 521 n. 2.

The International Association of Assessing Officers ("IAAO") has standardized these ratios and indicators, and those standards, set forth in its *Standard on Ratio Studies*, are widely accepted as the best criteria for judging the adequacy of a property assessment. *See* Notes of Testimony ("N.T."), 12/11/06, at 69, 72–74; Report of Richard R. Almy &

Robert C. Denne, Plaintiffs' Exhibit 1, at 11–12. The report of appellees' expert, a former IAAO executive director, relied upon the IAAO standard ratios for uniformity, and the trial court credited and relied upon both the expert's report and his testimony. *See* Trial Ct. Op. at 19–20. For example, under the IAAO standards, which were first adopted in 1980, a COD should generally not exceed 15. More precisely, the IAAO standards for a single-family residential property should be 10% or less for newer, more homogenous areas; 15% or less for older, heterogeneous areas; and 20% or less for rural residential and seasonal areas. Trial Ct. Op. at 19–20; *see also* Almy & Denne Report at 11–12. The IAAO standard PRD range is 0.98 to 1.03. Trial Ct. Op. at 20; *see also* Almy & Denne Report at 11–12.

With these general principles in mind, we now turn to the parties' arguments. Allegheny County claims that its base year method of valuation constitutes neither a facial nor an as-applied violation of the Uniformity Clause.[28] Responding to the trial court's finding that the base year system was invalid on its face, the County characterizes the trial court's conclusion as "premised on the notion that the base year system, by its reliance on static property values, creates in effect a classification of certain property owners who bear increasing or decreasing tax burdens for no legitimate reason," and defends the Legislature's "classification" as rationally related to a legitimate state interest. County's Brief at 32. Drawing on the trial testimony of the County Manager, the County states that the interest underlying the implementation of a base year method of valuation is "the need to create and preserve a stable and predictable local real estate tax assessment system." County's Brief at 34–35. This interest in stability and predictability, maintains the County, benefits all entities involved in property taxation.

At the county level, the County contends that stability and predictability are imperative because of: (1) the costliness of

28. Appellants Allegheny County, Allegheny County Chief Executive Daniel Onorato, and Allegheny County Chief Assessment Officer Deborah Bunn filed a single brief.

countywide reassessments; and (2) the substantial repercussions of performing countywide reassessments.[29]  At the local level, the County argues that reassessments significantly hamper taxing bodies as they manage their budgets and levy local property taxes.  Additionally, municipalities and school districts are burdened by the difficulty in estimating the reserves needed for possible tax refunds and in calculating the millage rates when reassessments are conducted.  The County also contends that individual property owners benefit from the stability and predictability of a base year system because consecutive countywide reassessments cause many taxpayers to suffer from the "sticker shock" of receiving consecutive notices of substantial increases in the value of their property, without any improvements having been made.  Consequentially, argues the County, taxpayers lack a stable and consistent environment to budget their personal finances.

Having set forth what it believes to be a legitimate state interest, the County next argues that the base year method of property valuation bears a rational relationship to that purpose.  The County maintains that "[w]hat is pejoratively viewed as the base year's vice is ultimately its saving virtue"- the creation of "a constant and certain set of property values that do not fluctuate wildly from year to year."  County's Brief at 37.  In sum, the County contends that the Legislature "reasonably determined that the legitimate interests of stability and predictability would best be achieved by allowing real property to be valued and taxes [to] be levied based upon a constant set of unchanged values for a reasonable length of time and that this interest in stability and predictability outweighed the interest in keeping up with the latest changes and fluctuations in market values." *Id.* at 38.

Turning to the trial court's opinion, the County maintains that the court abused its discretion when invoking the proportionality principle (*i.e.*, that taxpayers should only have to pay

29.  The County notes that it cost in excess of $25 million to perform the 2002 base year assessment, and that any reassessment results in a substantial number of assessment appeals (approximately 90,000 in 2001 and 2002), which leads to further costs to the County.

their proportionate share of the cost of government) to strike down the assessment law provisions providing for a base year method of valuation. The County argues that, to find the proportionality principle satisfied, the trial court unreasonably would require "mathematically precise calculation." County's Brief at 40.

Contrary to the trial court's conclusion, the County asserts that in *Narehood v. Pearson*, 374 Pa. 299, 96 A.2d 895, 899 (1953), this Court previously held that the concept of a "base" standard is a reasonable and uniform way to constitutionally assess property.[30] And in cases such as *Deitch, supra,* argues the County, this Court stated that the minimum necessary to satisfy the Uniformity Clause's proportionality principle is application of a common standard (the same ratio) to all properties within the taxing district. In the present case, the County notes that there is no dispute that, under the base year system, Allegheny County has applied the same ratio (100% of market value) when assessing all properties. By adhering to this standard, contends the County, it has satisfied the minimum requirements of the Uniformity Clause.

The County further maintains that, contrary to the trial court's decision, a base year method of valuation is, in fact, responsive to market changes due to the statutory mechanisms in place to protect taxpayers where a base year system may result in inequity. Citing the Commonwealth Court's decision in *Appeal of Armco, Inc.*, 100 Pa.Cmwlth. 452, 515 A.2d 326 (1986), the County contends that in a situation where it appears that the absence of a recent countywide reassessment causes inequitable assessments, the assessment laws allow the county's EPR to be replaced with the county's CLR, which is more reflective of market changes, and thus cures any potential inequity.[31] The County asserts that this Court

---

**30.** In *Narehood*, 96 A.2d at 899, this Court stated that "[i]t is not unconstitutional to adopt as a base a reasonable and uniform standard of valuation for each property of the same class in a district or proper area, since substantial uniformity in assessments and in the application of tax laws satisfies the Constitution."

**31.** In *Armco*, the Commonwealth Court applied Section 704 of the Fourth to Eighth Class County Assessment Law, 72 P.S. § 5453.704,

endorsed such a view in *Downingtown, supra,* as we cited favorably to the dissenting opinion in *Vees v. Carbon County Board of Assessment,* 867 A.2d 742 (Pa.Cmwlth.2005), which observed how a STEB-calculated CLR works to maintain uniformity in a base year system. The County contends that *Downingtown* supports the constitutionality of a base year method of valuation because the decision: (1) reaffirms that the minimum needed for satisfying uniformity requirements is application of the county CLR; and (2) undercuts the trial court's conclusion that a base year system is unresponsive to market changes.

The County also argues that a base year assessment system's failure to account for "immediate" market changes does not render the system unconstitutional. The County asserts that the trial court and appellees erroneously equate constitutionality "with slavish adherence to a standard of valuation based solely and exclusively on current market value determined on a yearly basis." County's Brief at 48.

Finally, the County contends that Allegheny County's base year system has not resulted in such pervasive countywide inequities as to render the entire assessment system unconstitutional. The County argues that the trial court erred when exclusively relying on the statistical indicators (the COD and PRD) promulgated by the IAAO, a private organization, because neither the General Assembly nor this Court has declared IAAO standards to be the definitive legal benchmark of tax assessment uniformity, and because such exclusive reliance runs counter to this Commonwealth's case law. Citing a number of Commonwealth Court cases, as well as a U.S.

which mirrors Section 518.2 of the General County Assessment Law, 72 P.S. § 5020–518.2, which is discussed above. Additionally, the *Armco* court noted that:

Quite apparently, the [assessment law's] theory is that, by holding out to property owners the opportunity to take appeals which can test the base-year-value predetermined-ratio equation, the results of those appeals will inform the county and force it to monitor and reform its assessment levels to reflect reality. The STEB common level ratio operates as a multiplier used to convert current market values to equivalent base-year assessed values.

*Armco,* 515 A.2d at 330.

Supreme Court case,[32] the County maintains that case law required the trial court to look beyond statistical indicators and focus on "the cumulative effects of a variety of factors in determining whether a county's assessment system has tipped into pervasive non-uniformity." County's Brief at 53. The County contends that the facts of the present case do not rise to the level of pervasive inequity found in prior Commonwealth Court cases. The County also asserts that its assessment system was found to be more uniform than those of other Pennsylvania counties, and that its base year is based on "a countywide assessment of relatively recent vintage." *Id.* at 57. The County further submits that its CLR is within the permissible level of deviation allowed by state law, and that the CODs in Allegheny County are lower than those that the Commonwealth Court previously has held as evidencing inequity. In sum, the County maintains that the trial court lacked sufficient facts to support its finding of non-uniformity, and usurped the powers of the General Assembly, in violation of the doctrine of separation of powers.

Appellees disagree.[33] Maintaining that the trial court correctly found that the base year system produced unreasonable discriminatory results in violation of the Uniformity Clause, appellees assert that the Uniformity Clause requires that "[a]ll taxes shall **be** uniform"; not that "taxes **were** uniform at some arbitrary point in the past." *See* Pierce Brief at 19 (emphasis by appellees). Properties in neighborhoods and communities that have experienced depreciation, contend appellees, are being taxed for the current cost of government based on values that no longer exist.

32. *See, e.g., Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County, W. Va.,* 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989); *Millcreek Twp. v. County of Erie,* 714 A.2d 1095 (Pa.Cmwlth.1998); *Ackerman v. Carbon County,* 703 A.2d 82 (Pa.Cmwlth.1997); *City of Harrisburg v. Dauphin County Bd. of Appeals,* 677 A.2d 350 (Pa.Cmwlth. 1996); *City of Lancaster v. Lancaster County,* 143 Pa.Cmwlth. 476, 599 A.2d 289 (1991).

33. Although two appellee briefs were filed, one on behalf of the Pierce plaintiffs and one on behalf of the Clifton plaintiffs, we will present their arguments collectively.

Appellees submit that the evidence of non-uniform treatment in this scheme is overwhelming. Appellees first cite Allegheny County's COD and maintain that, although Allegheny County has adopted a COD of 15 or less, consistent with accepted IAAO norms, the County's actual COD, as well as the CODs of virtually all Pennsylvania counties, exceed this standard. Appellees also reference Allegheny County's PRD of 1.11, which they assert demonstrates that the inequity in property assessments has fallen more harshly on lower-value property owners. Appellees contend that there is no legitimate justification for a scheme of taxation that taxes lower-value properties at a higher ratio than other properties. Appellees argue that long-term use of the base year method of valuation has produced this unconstitutional non-uniformity of assessments because a base year system ignores the inevitable and disparate value changes among properties within the same "classification," with the heaviest burden of the disparate treatment falling on those who can least afford it—owners of properties in declining or stagnant neighborhoods.

Although recognizing that, under this Court's Uniformity Clause jurisprudence, real property is to be treated as a single class entitled to uniform treatment, appellees, cognizant of our analysis in *Downingtown,* assert that no legitimate state interest is furthered by a distinction between property owners whose properties have declining or stagnant values and those whose property values have substantially increased. Referencing *Cumberland, supra,* and *Narehood, supra,* appellees acknowledge that reasoned distinctions between categories of properties may be appropriate in some cases, but they argue that there is no justification for applying a different ratio of assessed to actual value to properties within the same classification. Appellees contend that stability and predictability cannot justify unconstitutional treatment, especially in property tax cases where the justification has no relation to the situs of a property, and where all property must be treated as a single class.

Disputing the County's cost argument, appellees maintain that regular assessments, which allow for more uniform re-

sults, cost a county no more than sporadic, irregular ones. As for the County's claim that the 2001 reassessment cost $25 million to complete, appellees aver that the County's primary witness failed to explain how much of that sum went to the reassessment, and how much went to the normal operations of the County assessment office from 1997 to 2001. Additionally, appellees cite a number of circumstances that led to the abundance of appeals following the 2001 reassessment that they claim the County failed to account for, such as problems with how the reassessment was executed and the fact that the County concurrently changed the County's EPR. Appellees also argue that subsequent reassessments in 2002 and 2005 cost much less, and that, having invested $3.5 million in a state-of-the-art computer system to aid in property assessments in 2005, which the County has yet to use, future assessments should cost the County even less. Thus, appellees maintain that whatever practical limitations assessment officials may have had in 1982, when the use of a base year method was authorized by statute, those limitations no longer exist.

Quoting the U.S. Supreme Court's decision in *Cumberland Coal Co. v. Board of Revision*, 284 U.S. 23, 29, 52 S.Ct. 48, 76 L.Ed. 146 (1931), appellees further contend that "[a]pplying the same ratio to the same assigned values, when the actual values differ, creates the same disparity in effect as applying a different ratio to actual values when the latter are the same." When real value differences are systematically ignored, appellees argue that it is as if the taxing body is applying a different ratio to similarly situated properties. Appellees also challenge the County's argument that use of the CLR by taxpayers via the appeals process is sufficient to correct non-uniform assessment. Citing *Downingtown, supra,* and *Beattie, supra,* appellees submit that this Court has noted the inadequacies of attempting to achieve uniformity through use of the CLR, and has recognized the importance of considering a range in applicable averages, as expressed in the COD. Application of the CLR, argue appellees, cannot substitute for the elimination of the non-uniformity in the first place. Appel-

lees add that the appeals process is meant to correct discrete errors in oversight or calculation, and is not meant to correct mass inequitable results caused by an inherently flawed, systemic method of assessment. Moreover, appellees contend, the present system impermissibly places the burden on taxpayers to undertake administrative appeals to attempt to remedy the lack of uniformity.

Finally, appellees maintain that the trial court did not rely exclusively on the IAAO standards, but considered extensive evidence of substantial and widely divergent change in Allegheny County property values. Appellees submit that, for example, the court also relied upon a report on disparate property appreciation prepared by the Allegheny County Chief Executive's Office, and a report issued by the Office of Federal Housing Enterprise Oversight, which described property value change in Pennsylvania. Moreover, appellees note, ratio studies and their results are matters of fact, which the County has not disputed. Appellees contend that the COD and PRD results in Allegheny County demonstrate the actual, substantial non-uniformity in assessments, which proves the constitutional flaw.

In sum, appellees state that, following the trial court's proper invalidation of the base year method of assessment, annual assessments based on current market value are the only constitutional system of property valuation remaining in Pennsylvania. Alternatives to annual reassessments, maintain appellees, can only be created by the General Assembly, which has yet to address the inherent flaws in the base year system. Thus, appellees conclude that the trial court did not err in ordering Allegheny County to complete a reassessment by 2009.

This matter has been ably briefed and argued, and is now ready for decision. Our primary task is to determine whether appellees successfully demonstrated that the assessment law provisions permitting a base year method of valuation "clearly, palpably, and plainly" violate the Uniformity Clause of the Pennsylvania Constitution. We hold that as currently applied in Allegheny County, the base year system is unconstitutional.

The evidence presented at trial demonstrates that the Allegheny County scheme, which permits a single base year assessment to be used indefinitely, has resulted in significant disparities in the ratio of assessed value to current actual value in Allegheny County. The disparity is most often to the disadvantage of owners of properties in lower-value neighborhoods where property values often appreciate at a lower rate than in higher-value neighborhoods, if they appreciate at all. For the reasons that follow, we conclude that, to the extent that the provisions of the General County Assessment Law, 72 P.S. § 5020–402(a), and the Second Class County Assessment Law, 72 P.S. § 5452.4(a.2), permit indefinite use of a base year method of valuation, those provisions, as applied here, violate the Uniformity Clause.

Preliminarily, however, we make clear that, unlike the trial court, we are not prepared to hold the statutory base year provisions facially unconstitutional. A statute is facially unconstitutional only where no set of circumstances exist under which the statute would be valid. *Wash. State Grange v. Wash. State Republican Party,* — U.S. —, —, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008) (quoting *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). "In determining whether a law is facially invalid, [a court] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id.* (citing *United States v. Raines,* 362 U.S. 17, 22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) ("The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined.")).

It appears that this Court has yet to consider thoroughly the standard by which facial challenges are evaluated, or the facial challenger's corresponding burden of proof.[34] However,

---

**34.** Although not directly addressing the contours of a facial challenge, we have addressed the differences between facial and as-applied challenges in a number of scenarios, often for procedural purposes. *See, e.g., Phila. Entm't & Dev. Partners v. City of Philadelphia,* 594 Pa. 468, 937 A.2d 385, 392 n. 7 (2007) ("[A]s-applied challenges require applica-

the U.S. Supreme Court has recently addressed this issue, and its opinion is informative. *See Wash. State Grange,* —— U.S. at ——, 128 S.Ct. at 1190. Prior to *United States v. Salerno, supra,* the High Court required only that a party making a facial challenge establish that the invalid applications of a statute must be real and substantial, and are "judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *see also Washington v. Glucksberg,* 521 U.S. 702, 739–40, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Stevens, J., concurring in judgments) (discussing cases).[35] In *United States v.*

tion of the ordinance to be ripe, facial challenges are different, and ripe upon mere enactment of the ordinance."); *Beattie,* 907 A.2d at 527–29 (holding that court can exercise equity jurisdiction over taxpayer's challenge that property assessment system is unconstitutional facially or as-applied); *Lehman v. Pa. State Police,* 576 Pa. 365, 839 A.2d 265, 275 (2003) (distinguishing between as-applied and facial constitutional challenges when applying doctrine of administrative exhaustion); *Kepple v. Fairman Drilling Co.,* 532 Pa. 304, 615 A.2d 1298, 1303 (1992) (distinguishing between facial and as-applied constitutional challenges for purposes of providing notification to Attorney General pursuant to Pa.R.A.P. 521(a)); *Commonwealth v. Noel,* 579 Pa. 546, 857 A.2d 1283, 1288 (2004) (Saylor, J. concurring) (discussing difference between as-applied and facial void-for-vagueness claims under First Amendment of U.S. Constitution).

**35.** This standard was originally applied in the context of overbreadth challenges under the First Amendment, where a statute may be facially challenged as overbroad. *See, e.g., New York v. Ferber,* 458 U.S. 747, 769–71, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); *Broadrick,* 413 U.S. at 615, 93 S.Ct. 2908; *accord Commonwealth v. Davidson,* 595 Pa. 1, 938 A.2d 198, 208 (2007); *Commonwealth v. DeFrancesco,* 481 Pa. 595, 393 A.2d 321, 330–31 (1978). In such cases, where the "plainly legitimate sweep" standard has been more thoroughly described, a statute may be "overturned as impermissibly overbroad because a 'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.' " *Wash. State Grange,* —— U.S. at ——, 128 S.Ct. at 1191 n. 6 (quoting *New York v. Ferber,* 458 U.S. 747, 769–71, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)) (internal quotation marks omitted). While there are overlaps in evaluation, the High Court has distinguished between First Amendment facial challenges and facial challenges based upon other constitutional provisions. *See id.* at 1190–91. In any event, as evidenced by *Washington State Grange* and *Crawford v. Marion County Election Board,* the Court has since utilized this standard in the non-First Amendment context. *Wash. State Grange,* —— U.S. at ——, 128 S.Ct. at 1190; *Crawford v. Marion County Election Bd.,* —— U.S. ——, ——, 128 S.Ct. 1610, 1623, 170 L.Ed.2d 574 (2008) (Opinion Announcing the Judgment of the Court).

*Salerno,* the High Court seemed to suggest a stricter standard, stating that "a facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." 481 U.S. at 745, 107 S.Ct. 2095. Recently, however, the Court seems to have settled on the "plainly legitimate sweep" standard. *See Wash. State Grange,* —— U.S. at ——, 128 S.Ct. at 1190 ("While some Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep.' ") (internal quotation marks omitted); *see also Crawford,* —— U.S. at ——, 128 S.Ct. at 1623 ("A facial challenge must fail where the statute has a 'plainly legitimate sweep.' ") (further internal quotation marks omitted).[36]

In the present case, the trial court found the base year method of assessment "invalid on its face because it inevitably produces arbitrary, unjust, and unreasonably discriminatory results." Trial Ct. Op. at 29. The court based its conclusion on the fact that the legislation permitting use of a base year system was not intended to tax all real property at the same rate, and therefore it failed to meet the requirements of the Uniformity Clause. However, a presumption of inevitable unjust application and a perceived flaw in the General Assembly's intent cannot alone render the statute facially invalid.[37]

**36.** The difference is essentially one of the degree of burden placed on the challenger. Under the *Salerno* standard, the challenger must establish that there is no set of circumstances under which the Act would be valid. 481 U.S. at 745, 107 S.Ct. 2095. Under the more lenient "plainly legitimate sweep" standard, the challenger need only demonstrate that a "substantial number" of the challenged statute's potential applications are unconstitutional. *See New York v. Ferber,* 458 U.S. at 769–71, 102 S.Ct. 3348.

**37.** Even under the "plainly legitimate sweep" standard, a statute is only facially invalid when its invalid applications are so real and substantial that they outweigh the statute's "plainly legitimate sweep." Stated differently, a statute is facially invalid when its constitutional deficiency is so evident that proof of actual unconstitutional applications is unnecessary. For this reason (as well as others), facial challenges are generally disfavored. *See Wash. State Grange,* —— U.S. at ——, 128 S.Ct. at 1191 ("Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence,

It appears that, to some degree at least, the trial court's conclusion that the base year system is facially invalid is premised on evidence of how the base year provisions, as applied in the particular circumstances here, resulted in an unconstitutional disparate scheme of taxation. Moreover, the trial court's facial conclusion failed to contemplate potentially valid applications of the base year provisions. It is true that the applicable statutory construct does not mandate periodic reassessments, much less periodic reassessments within a specified timeframe. Significantly, however, the statute does not prohibit a taxing authority from engaging in periodic reassessments to "update" the base year. It seems obvious that use of a base year system—with its attendant economies, stability, and predictability—would not implicate the Uniformity Clause if, for example, a county conducted adequate periodic reassessments, or if it could be shown that property values in a particular county remained relatively unchanged, or those values had virtually the same rate of change. It may well be true that a base year system, if unadjusted, will inevitably lead to taxing inequity. But those inequities, in a particular county, may take years to rise to the level of constitutional infirmity. The governing presumption of constitutionality, the high burden to show unconstitutionality in a facial challenge, and the flexibility the statutory scheme permits, combined with the fact that appellees' facial challenge relies on evidence of the provisions' inequitable application here, and the further fact that it appears there are circumstances where the base year provisions could be constitutionally applied, lead us to conclude that appellees' facial challenge fails under even the more lenient "plainly legitimate sweep" standard.[38] Thus, we cannot affirm the trial court on its terms. Appellees' claim is more appropriately evaluated in

they raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.' ") (quoting *Sabri v. United States,* 541 U.S. 600, 609, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004)).

**38.** Like the assumptions forming the basis of the trial court's finding of facial invalidity, the County's arguments addressing "classification" and proportionality in the context of appellees' facial challenge are misplaced. Those arguments, however, are relevant in the as-applied context and will be addressed below.

the context of an as-applied challenge. *See Wash. State Grange,* —— U.S. at ——, 128 S.Ct. at 1187.

■ The County's arguments regarding appellees' as-applied challenge are not entirely consistent. Maintaining that any "classification" resulting from long-term application of the base year scheme is rationally related to a legitimate state interest, the County seems to initially concede non-uniformity. With its next argument, however, the County denies non-uniformity and contends that the base year system does not result in inequitable assessments because application of either the EPR or CLR satisfies the Uniformity Clause's proportionality requirement. We will address these arguments as alternatives, beginning with the County's claim that the trial court misapplied the proportionality principle in concluding that the base year system results in non-uniformity.

■ To reiterate, the proportionality principle, which forms the basis of the uniformity requirement, requires that taxpayers pay no more or less than their proportionate share of the cost of government. *Downingtown,* 913 A.2d at 199. To ensure proportionality, all property must be taxed uniformly, with the same ratio of assessed value to actual value applied throughout the taxing jurisdiction. In the present case, there is ample evidence that Allegheny County's use of the base year system without periodic reassessment has failed to satisfy this principle, and thus violates the Uniformity Clause.

Property values may change over time and at different rates, but when a taxing body freezes values with, for instance, the prolonged use of a base year's property values, the resulting disparities throughout the taxing jurisdiction produce inequities, and those inequities tend to increase over time. *See* Trial Ct. Op. at 38; N.T., 12/11/06, at 77, 141. The farther away from the base year a county gets, the more likely the county's PRD will become either regressive or progressive, as property values in different neighborhoods change at varying rates. Such is the case in Allegheny County where the data of record demonstrates that, since the 2002 base year

assessment, Allegheny County municipalities have experienced varying rates of appreciation and depreciation.

For example, property taxes for the Woodland Hills School District continue to be based on the 2002 base year market values, even though the County's data shows that property values of the municipalities in the school district changed at significantly different rates by 2005. The rates of change recorded between 2002 and 2005 were as follows:

| | |
|---|---|
| Braddock | − 16.03% |
| Braddock Hills | + 2.84% |
| Chalfant | + 13.26% |
| Churchill | + 15.7% |
| East Pittsburgh | + 14.94% |
| Edgewood | + 35.87% |
| Forest Hills | + 18.85% |
| North Braddock | − 8.99% |
| Rankin | + 6.37% |
| Swissvale | + 16.34% |
| Turtle Creek | + 14.69% |
| Wilkins | + 14.65% |

Trial Ct. Op. at 38. These disparities are reflected in the recent STEB statistics for Allegheny County. In 2005, Allegheny County's COD was calculated at 22.3, and is currently 30.2. As described above, a COD of 30.2 signifies that roughly half of the properties in Allegheny County either exceed the common level ratio by 30.2% or fall below the common level ratio by more than 30.2%.[39] The County's PRD was calculated at 1.10 in 2005, and is currently calculated at 1.12.[40] All are well outside the standards the IAAO deems a fair measure of equality. *See supra* at 27–38 (summarizing). The County

**39.** The 2005 STEB statistics also indicate that the CODs of a significant number of Pennsylvania's counties exceed the IAAO standard, with the CODs of 37 of Pennsylvania's 67 counties estimated at 30 or greater. The trial court also noted the significant fact that the 18 counties with CODs over 40 have one thing in common: they have not conducted a comprehensive countywide reassessment in over two decades. Trial Ct. Op. at 30. Additionally, some counties have not conducted countywide reassessments for over a quarter of a century. For example, Blair County last conducted a reassessment in 1958, Butler County in 1969, Lackawanna County in 1973, and Forest County in 1974. *See* Trial Ct. Op. at 27–28.

**40.** For up-to-date STEB statistics, *see* the official STEB website at http://www.steb.state.pa.us.

itself was well aware of the problems caused by the divergent rates of change, and attempted, unsuccessfully, to remedy the problem with the passage of Ordinance 15 in March 2005.[41]

Additional evidence of the disparate rates of change within the County and the resulting non-uniformity, which goes unaccounted-for with use of the long-term base year method of valuation without a reassessment requirement, was provided by appellees' experts. Richard R. Almy, appellees' expert, conducted a study based on sales of single-family residential properties in Allegheny County that sold once between 1998–1999, and again between 2002–2005, for a price of at least $50,000. Mr. Almy's conclusions demonstrated the unsurprising fact that market values inevitably fluctuated in a non-uniform manner among neighborhoods within Allegheny County. As Allegheny County's PRD reflects, the higher-value homes in Mr. Almy's study appreciated at a significantly higher rate than the lower-value homes. *See* Trial Ct. Op. at 39–41; Almy Report at 8–9.[42]

Further, the unrefuted testimony of Anthony C. Barna, another of appellees' witnesses, who was found credible by the trial court, was based on a market study of Allegheny, Westmoreland, and Beaver Counties. Like the Almy Report, Mr. Barna's study demonstrated that the unadjusted base year system ignores market realities and fails to account for the impact of market forces on a property's value over time. Trial Ct. Op. at 41; Barna Report, Plaintiffs' Exhibit 5. Mr. Barna determined in approximately 25 municipalities in Allegheny

41. As described above, Ordinance 15 provided for the Chief Assessment Officer to: (1) determine the actual value of each property; (2) perform an analysis of the increase or decrease in valuations in the different neighborhoods; and (3) assign a specific value limitation for each neighborhood—either decrease, no change, one percent, two percent, three percent, or four percent. That Ordinance was found to violate the Home Rule Charter of Allegheny County, the Second Class County Charter Law, Pennsylvania property assessment laws, and the Uniformity Clause in *Sto–Rox School District v. Allegheny County*, 153 P.L.J. 193 (Pa. Com. Pl. Allegheny 2005).

42. For example, a property in the North Hills School District had an annualized rate of change of–1.88; while, at the other extreme, a property in the Pine–Richland School District had a rate of change of +13.65. Almy Report at 9.

County that there was a steady rate of increase in property values between 1996 and 2006, but that the annual rates of change differed significantly from municipality to municipality. Trial Ct. Op. at 41–42; Barna Report at 8.

In response to the trial court's conclusion based squarely on these findings of inequity, the County claims that the trial court interpreted the proportionality principle to require "mathematically precise calculation." *See* County's Brief at 40. The County, however, is mistaken. Judge Wettick fully appreciated that the Uniformity Clause requires substantial uniformity, rather than mathematically precise uniformity, and that it permits practical inequities. Trial Ct. Op. at 13. Judge Wettick's finding of unconstitutional inequity in Allegheny County derived from his concomitant, and correct, realization that the Uniformity Clause does not tolerate the substantial inequities described above; inequities that inevitably result from the prolonged use of base year assessment values in a county where property values have changed at divergent rates.

We recognize, of course, the force of the County's argument that the various standards and measures we have addressed (the CLR, COD, PRD, and IAAO criteria), which demonstrate substantial and pervasive inequity, have not been legislatively adopted and commanded. But that does not make the measures irrelevant. These standards, all of which derive from objective data, speak to the real-life effect of long-term use of a base year system without reassessment. There is no suggestion by Judge Wettick, or this Court, that deviation from one or more of these standards proves a lack of uniformity. Nor is there any suggestion that a "mathematically precise" lack of deviation is required for the base year system, as applied, to survive constitutional scrutiny. But these objective measures do provide a factual predicate upon which to judge the as-applied effect of this particular system of property taxation. And, we further agree with Judge Wettick that these standards, along with their factual underpinnings, prove the lack of uniformity that has arisen over the years in Allegheny County.

The County contends that all that is necessary to satisfy the Uniformity Clause is application of a common standard to all properties within the taxing district, which Allegheny County maintains that it does through application of an EPR of 100% (*i.e.*, assessed value is 100% of actual, fair market value). However, applying the same ratio to an outdated base year "actual" value, where the current actual value of a substantial number of properties has changed dramatically, creates the same disparity in effect as applying a different ratio to current actual values. *See Cumberland,* 284 U.S. at 29, 52 S.Ct. 48. Of course, applying an EPR of 100% to properties in Allegheny County when they were assessed at 100% of their current actual fair market value in the 2002 base year ensured uniformity at that time. But in subsequent years, any time a given property's "real-time" actual value has changed, its "actual" value for property tax purposes remained static—and thereby became inaccurate—because Allegheny County continued to use the 2002 base year "actual" value. The County's perpetually fixed assessment ignored the well-documented disparate rates of change that occurred following the 2002 base year assessment.

While there is nothing inherently wrong in applying an EPR of 100%, applying that EPR while utilizing an outdated base year assessment merely transforms a property's old and stale "actual" value (the 2002 base year actual value) into the property's current assessed value. As a result, both a property's actual value and its assessed value remain frozen at the property's 2002 actual value for as long as the assessment serves as the base year, irrespective of actual changes in value. In short, application of an EPR of 100%, while appropriate initially, does nothing to ensure uniformity over time unless periodic reassessments are conducted.

The County's argument respecting the CLR—the ratio of assessed to current market value in a county—is similarly unpersuasive. The County submits that case-by-case, corrective application of a county's CLR, through the appeal process, adequately satisfies the proportionality principle and the Uniformity Clause. The County maintains that use of the CLR,

which reflects "the reality of property appreciation and depreciation," as opposed to the EPR, fully comports with the proportionality principle. *See* County's Brief at 45 (citing *Appeal of Armco, Inc.,* 100 Pa.Cmwlth. 452, 515 A.2d 326 (1986)). The County thus contends that a taxpayer's right to an assessment appeal to correct individual disparities arising from the absence of a recent countywide reassessment satisfies uniformity by allowing the EPR to be replaced by the CLR.

There may well be circumstances where use of the CLR and the individual appeal process adequately serves to address cases of particular inequity, and as case law demonstrates, both taxpayers and municipalities make use of the appeals process. But that process is not adequate when the inequity is pervasive, as the evidence demonstrates that it has become the case in Allegheny County. The County cannot satisfy the proportionality requirement by shifting the burden of achieving uniformity to the taxpayer or aggrieved taxing entity (most often the local public school district), whom the County would task with correcting its own constitutional deficiency. Relying upon taxpayers to "force" application of the CLR through individual assessment appeals is no substitute for a constitutionally uniform property assessment in the first instance. The County's expressed concern for "the reality of property appreciation and depreciation" counsels in favor of periodic countywide accuracy, not saddling taxpayers with the burden of curing the County's constitutionally deficient method of taxation in piecemeal fashion.

Furthermore, even if the appeal process were a satisfactory mechanism through which to achieve uniformity in the face of widespread disparity, the appeal process only affects the property immediately before the Board. *See Beattie,* 907 A.2d at 527 ("[W]hile an appeal before the Board may be capable of lowering the assessment on any individual appellant's property, it does not appear that any systematic under-assessment of higher-value properties can be cured through a series of administrative appeals taken by members of the asserted class of lower-value property owners. Therefore, even if all low-

value property owners have their valuations reduced to more accurate figures, the alleged discriminatory effect, though lessened, would remain.") (footnote omitted); *see also* Almy Report at 12–13. The successful appeals of over-assessed property owners do not decrease the values of other over-assessed properties whose owners may not have the awareness, time, or wherewithal to appeal. Furthermore, successful taxpayer appeals do not increase the assessments of under-assessed properties, whose owners have no reason to appeal. Assessments of under-assessed properties are only "forced" into conformity with the county CLR by an appeal of an aggrieved municipal entity, most often the school district, and the extent to which taxing bodies pursue assessment appeals varies from municipality to municipality. Finally, as the trial court aptly noted, "if this appeal process were a viable method of equalizing assessments, there would not be eighteen counties in Pennsylvania with CODs of 40 or more and another nineteen counties with CODs between 30 and 40." Trial Ct. Op. at 48 (footnote omitted).

■ Alternatively, seeming to concede non-uniformity, the County next claims that any lack of uniformity resulting from its continuing application of a dated base year is rationally related to Allegheny County's legitimate governmental interest in creating and preserving a stable and predictable local real estate tax assessment system, and is thus excusable. This argument fails for a number of reasons. First, the Uniformity Clause commands that similarly situated taxpayers should be taxed similarly. Given that the present matter involves similarly situated taxpayers, an inequity in assessments, beyond the practical, violates the Uniformity Clause.[43] The lack of uniformity resulting from prolonged use of an outdated base year assessment, caused by market forces or other changes, cannot be characterized as a "classification" in an effort to excuse the non-uniformity. For the aggrieved

43. Although this Court has recently acknowledged that the uniformity requirement does not necessarily eliminate "any opportunity or need to consider meaningful sub-classifications" in property taxation, *Downingtown*, 913 A.2d at 200, there is no such need here.

taxpayer, the classification is akin to the arbitrariness of being struck by lightning.

Second, even if disparate treatment (*i.e.*, a classification) were permissible under these circumstances, the County does not base its supposed classification on any legitimate distinction. Instead, through perpetual use of the base year system, the County permits the inevitable vicissitudes of the real estate market to define the "classification" at issue, and then attempts an after-the-fact explanation why such non-uniform treatment is allowable. Furthermore, the County's reasons why its base year system's resulting non-uniformity should be tolerated—stability and predictability—cannot justify a taxing scheme that routinely taxes property owners with declining or stagnant property values at a higher rate of assessed-to-actual value than property owners with stable or appreciating property values. And, even if such a governmental interest were valid under these circumstances, the County fails to demonstrate how this classification (overburdened property owners with declining or stagnant property values) is rationally related to the governmental interests in stability and predictability. A valid classification must be rationally related to a legitimate governmental interest. Accordingly, Allegheny County's argument, that the non-uniformity resulting from its base year system is excusable, fails.

For the foregoing reasons, we hold that, as applied in Allegheny County, the statutory base year system of taxation at issue, which approves the prolonged and potentially indefinite use of an outdated base year assessment to establish property tax liability, violates the Uniformity Clause of .the Pennsylvania Constitution. This conclusion is different and narrower than that of the trial court below, which found that the statutory base year provisions were facially unconstitutional, and accordingly deemed annual reassessment based on current market value as Allegheny County's only remaining option. We find no ineluctable constitutional deficiency with use of a base year system; it is only through the passage of time that a base year assessment will become stale, and thus unconstitutional.

Presumably, inequity will arise in such a system at different rates in different taxing authorities, depending upon the stability of property values in the municipality, the variety of real estate extant, and from other market factors. The point at which an unadjusted base year system becomes constitutionally problematic thus may vary from county to county. We recognize the desirability of the base year system from the county perspective, and it may be that such a system might operate fairly for more tax cycles than the base year in certain counties. Thus, it may be that a county could ensure a constitutional base year method of assessment by requiring periodic reassessment through an ordinance or as a matter of practice. The difficulty—and the risk to an authority employing an unadjusted base year system—is in determining the point at which a base year deviates to an extent where reassessment would be required.

It is not our charge to determine what may be the best system of assessment. Nor is this Court capable of fixing a point in time at which a base year automatically becomes unconstitutionally non-uniform. As the trial court noted, the General Assembly is the appropriate place in the first instance to fashion a more comprehensive and soundly constitutional scheme.[44] To that end, the trial court has provided a useful

44. Inexplicably deeming the "**prospect** of prompt legislative action" "unlikely," Mr. Justice Baer's Concurring Opinion takes the Court to task for "refus[ing]" to act "to fill a void where the legislature **has not acted**." Concurring at 719, 720–21, 969 A.2d at 1232, 1233 (emphasis added). As the temporal dissonance in the Concurrence's own logic might suggest, the precedents cited by the Concurrence for this sort of judicial activism are not at all analogous to the instant case. When considered in context, *Commonwealth v. Miller*, 585 Pa. 144, 888 A.2d 624 (2005), the only decision of this Court mentioned by the Concurrence, actually undermines its position. As the Concurrence notes, in *Miller*, this Court effectively filled in a legislative void when we crafted a definition of mental retardation in order to enforce the prohibition, announced three and-a-half years earlier by the U.S. Supreme Court in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), against imposing the death penalty on the mentally retarded. Significantly, in *Miller*, the issue of the appropriate definition was the whole case, and it had been litigated and decided below as well as briefed before this Court. *See, e.g., Miller*, 888 A.2d at 631 (noting that PCRA court had accepted and used certain definition); *id.* at 628 (noting that, on appeal here, inmate urged adoption of different defini-

tion). Moreover, as noted by Mr. Justice Eakin in his *Miller* concurrence, although "[m]ore than three years ha[d] passed since it was announced that each state had to set standards and procedures for adjudicating the mental retardation of a defendant in a capital case . . . no legislation ha[d] been passed to accomplish this." *Id.* at 633 (Eakin, J., concurring). Recognizing the issue as an "inherently legislative matter," Justice Eakin "concur[red] in the need for this Court to establish the necessary standards so that resolution of these cases may be had without further delay." *Id.* Such was not the case in *Commonwealth v. Mitchell*, 576 Pa. 258, 839 A.2d 202, 209 (2003), where we were first asked to address *Atkins,* and where we explicitly declined to formulate a definition of mental retardation, citing a lack of sufficient record evidence and adversarial argument on the issue. *See also Commonwealth v. Taylor*, 583 Pa. 170, 876 A.2d 916, 937 (2005) (following *Mitchell* and noting that "the parties' arguments are [ ] deficient, as both are focused solely on the issue of whether appellant satisfied the 'definition' of mental retardation, apparently proceeding upon the assumption that the criterion plucked from the definitions cited in the *Atkins* opinion are controlling as to that question"); *Commonwealth v. Williams*, 578 Pa. 504, 854 A.2d 440, 449 (2004) (following *Mitchell* ). Therefore, when viewed in the light of more than three years of judicial restraint that preceded it and the unavoidability of the fully-litigated constitutional position squarely presented, *Miller* does not support the Concurrence's urging this Court to promulgate legislative-style property tax uniformity standards in this case.

*Bartlett v. Strickland*, —— U.S. ——, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009), also discussed by the Concurrence, does not support the Concurrence's charge that this Court is "abdicat[ing] our fundamental responsibility to provide a proper framework for the assessment of actual constitutional violations." Concurring at 722, 969 A.2d at 1234. In selecting the fifty-percent voter population threshold in *Bartlett,* the plurality did not engage in a legislative inquiry requiring it to choose a measurement among multiple and competing alternatives. Rather, the plurality merely answered the yes-or-no question presented, which had been fully litigated by the parties. *See Bartlett, id.* at ——, 129 S.Ct. at 1238 ("The question is whether the statute can be invoked to require state officials to draw election-district lines to allow a racial minority to join with other voters to elect the minority's candidate of choice, even where the racial minority is less than 50 percent of the voting-age population in the district to be drawn.").

The parties *sub judice* have not argued for nor have they requested that we adopt the specific measure of uniformity that the Concurrence would incorporate into the Constitution, absent adversarial presentations on the question. *See, e.g.,* Clifton Brief at 20 (specifying remedy requested as merely "a countywide reassessment in Allegheny County as early as 2009"); County's Reply Brief at 10 (questioning "by what authority a trial court may impose" certain measures of uniformity). While there may very well come a time when this Court will be obliged to fill a legislative void in this area, it is today's decision that provides notice to the General Assembly to make any necessary amendments to the Commonwealth's property assessment laws so as to ensure their constitutionality when applied in the various counties. The likelihood

survey of the property assessment methods of our sister states, which shows that twenty-two of our sister states require annual reassessments, while twenty-six permit reassessments to be conducted at intervals over one year, though they still require periodic reassessment. Pennsylvania is the only state where legislation allows the use of a base year indefinitely. *See* Trial Ct. Op. at 54–56. The General Assembly has available to it the experience of our sister states, as well as the IAAO standards.

Ultimately, our task is decisional, and Allegheny County is currently left with a broken system of property taxation. In its effort to fashion a remedy, the trial court directed the Chief Assessment Officer of Allegheny County to conduct a reassessment no later than March 31, 2009, for use in the 2010 tax year, even if this Court had not yet issued a final order. We agree that reassessment is required. However, recognizing that the passage of time may require adjustment by the trial court, we will remand this matter to the trial court to determine Allegheny County's progress in executing a countywide reassessment and to set a realistic timeframe for its completion.

Justice SAYLOR and EAKIN, Justice TODD, Justice McCAFFERY, and Justice GREENSPAN join the opinion.

Justice BAER files a concurring opinion.

Justice BAER, concurring.

Appellees challenge the assessment laws of the Commonwealth, which permit real estate taxes to be levied on property values that are premised upon a stagnant base year market value for an indefinite period of time. The trial court found that because the base year assessment method does not require periodic reassessments, the assessment laws are

or unlikelihood of the General Assembly's doing so in the future is not for us to presume. Rather, we should await a future case where a party actually requests and argues for such relief and where the General Assembly's failure to respond to today's decision has become apparent. Respectfully, we view this restricted approach as the essence of the judicial function, and not an abdication of responsibility.

facially unconstitutional and, further, that the evidence of inequality in Allegheny County demonstrated that the assessment laws there under scrutiny were unconstitutional as applied. The Majority presently disagrees with the trial court's holding that the statutes are unconstitutional on their face, but agrees that the base year method of property valuation as applied in Allegheny County violated the Uniformity Clause of our constitution.[1] I agree with the Majority that the assessment laws are not, on their face, unconstitutional, and I further agree with the Majority that the evidence of inequality in Allegheny County demonstrated that the assessment laws, as applied, resulted in inequality that violated the Uniformity Clause. I differ from the Majority, however, regarding whether it is appropriate for this Court to set a constitutional threshold in the absence of legislative action. As is fully explained below, courts have repeatedly taken such action when necessary. I believe this case presents just such an instance. Accordingly, I write to explain why I believe we should establish a test for when the Uniformity Clause is violated, and then to articulate such a test.

Under a base year system of valuation, a county performs a threshold countywide assessment of all real property in the base year, and then uses each property's base year assessment (*i.e.*, assessed value) as that property's basis for taxation in the base year and in all subsequent years, pending a future reassessment. Maj. at 673, 969 A.2d at 1203; *Downingtown Area Sch. Dist. v. Chester County Bd. of Assessment Appeals*, 590 Pa. 459, 913 A.2d 194, 202–03 (2006). The base year assessment, however, obviously cannot capture and reflect market fluctuations that occur during years subsequent to the base year and preceding a reassessment. Nevertheless, as held by the Majority, the assessment laws permitting the use of a base year are not facially unconstitutional because use of a base year would not implicate the Uniformity Clause if, for example, a county conducted adequate periodic reassessments; if it could be shown that property values in a particular county

1. *See* the Uniformity Clause of the Pennsylvania Constitution, PA. CONST. art. VIII, § 1.

remained relatively unchanged; or if those values had virtually the same rate of change over the passage of time. Majority at 707, 969 A.2d at 1224.

The more difficult question is whether the use of the base year, as applied in this case, is unconstitutional. As the Majority describes, under the Uniformity Clause, countywide reassessments should result in all property in each county being valued fairly and consistently, when compared to other properties in the county. Maj. at 671–72, 969 A.2d at 1202–03. If the base year method of valuation will, in its operation or effect, produce arbitrary, unjust, or unreasonably discriminatory results, the uniformity requirement is violated. Maj. at 686, 969 A.2d at 1211 (citing *Allegheny County v. Monzo,* 509 Pa. 26, 500 A.2d 1096 (1985)). In property taxation, the uniformity requirement is based on "the general principle that taxpayers should pay no more or less than their proportionate share of government." Maj. at 686–87, 969 A.2d at 1212 (quoting *Downingtown,* 913 A.2d at 199).

In evaluating Appellees' position and the trial court's holding, as will be discussed more fully below, the Majority reviews a number of standards that have been developed for measuring whether a system of property valuation produces sufficiently uniform results. Maj. at 691, 969 A.2d at 1214. The Majority, however, recognizes that the various standards and measures it discusses have not been legislatively adopted. Maj. at 711–13, 969 A.2d at 1227–28. Thus, the Majority refuses to determine, based on the various standards and measures it recognizes as relevant, and, in fact, uses to conclude that there is an unconstitutional lack of uniformity in this case, the point at which at least a presumption should arise that a base year valuation system's deviation from actual market values runs afoul of the Pennsylvania Constitution's Uniformity Clause. Rather, the Majority opines that this Court should decline to fix a point where at least a presumption of unconstitutional non-uniformity arises because "the General Assembly is the appropriate place to fashion a more comprehensive and soundly constitutional scheme." Maj. at 715, 969 A.2d at 1229.

Respectfully, in my view, absent the unlikely prospect of

prompt legislative action, the Majority's decision not to offer substantive criteria for interpretation of the Uniformity Clause will result in ongoing uncertainty for the Commonwealth's many taxing authorities and property owners alike. The consequence will be hundreds of thousands of taxpayers and the local governments of the sixty-seven counties of this Commonwealth being uncertain about whether the result of this Court's decision means that their county has become unconstitutionally non-uniform and must therefore engage in a county-wide reassessment. Taxpayers and the groups that represent them will be unsure about whether to bring a lawsuit challenging their counties' assessment system. The counties themselves will be unsure whether their current assessed values satisfy or violates the Uniformity Clause, as interpreted herein. These pervasive uncertainties will lead to endless litigation throughout the Commonwealth with regard to whether each county's assessment scheme is unconstitutional, as applied. These lawsuits will result in inconsistent findings in the courts of common pleas as to the proper demarcation between constitutionality and unconstitutionality. Indeed, possibly premised upon substantially the same facts, some trial courts may find a county's property tax assessment unconstitutional, as applied, leading to direct appeals to this Court, while other trial courts will find a county's property tax assessment system constitutional, leading to appeals to the Commonwealth Court. With no uniform approach to evaluate the claims and defenses or to render consistent opinions on the constitutionality of each county's assessment scheme, the result will be an *ad hoc* evaluation of each county's particular disparities and assessment ratios, resulting in the waste of millions of dollars in what may be unnecessary reassessments and/or litigation costs, as well as the loss of incalculable amounts of judicial resources.

Although I generally agree that the legislature remains the optimum branch of government to fashion a comprehensive constitutional scheme, I also believe that it is entirely proper for this Court to articulate criteria for evaluating whether a peculiar factual scenario will meet constitutional muster under the Uniformity Clause. There is substantial precedent for courts acting in a situation such as this to fill a void where the

legislature has not acted. For example, in a recent case interpreting and applying Section 2 of Voting Rights Act of 1965, 42 U.S.C. § 1973, where Congress did not specify what percentage of minority voters in a district would call for the protections of Section 2 of the Voting Rights Act when it prohibited what courts have termed "vote dilution," and the United States Supreme Court had, until this case, avoided picking a number, the high Court established a numerical threshold, holding that only election districts in which minorities make up at least fifty percent of the voting age population are entitled to the protections of Section 2 of the Voting Rights Act that seeks to ensure and preserve minority voting power. *See Bartlett v. Strickland,* —— U.S. ——, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009) (Kennedy, J., opinion announcing the judgment of the Court). The bright line rule established in *Bartlett* makes litigation over the legality of particular districts less likely. Justice Kennedy reasoned that although the Court had in the past declined to decide the minimum size minority group necessary in the context of a vote dilution claim, its bright-line rule "provides straightforward guidance to courts and to those officials charged with drawing district lines to comply with § 2." *Id.* at 1245.

In *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 870, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), Justices O'Conner, Kennedy, and Souter explained why the Court in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), had established viability as the appropriate point for finding a compelling state interest in prohibiting abortion: "legislatures may draw lines which appear arbitrary without the necessity of offering a justification. But courts may not. We must justify the lines we draw. And there is no line other than viability which is more workable." *See also Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (finding unconstitutional Florida's procedures for determining sanity for purposes of execution, and setting forth guidelines for states to follow to ensure constitutionally adequate safeguards in future litigation); *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam)

(finding unconstitutional the imposition of the death penalty as cruel and unusual punishment in violation of the 8th and 14th Amendments to the United States Constitution, and suggesting that death sentences could be constitutionally imposed if states limit the class of murderers to which the death penalty may be applied); *Brooks v. Hobbie,* 631 So.2d 883, 889–90 (Ala.1993) (holding that in a redistricting case, the legislature has the initial responsibility to act, but in the event the legislature fails to act, the responsibility shifts to the state judiciary); *Morgan County Commission v. Powell,* 292 Ala. 300, 293 So.2d 830 (1974) (Heflin, C.J., dissenting) (recognizing that when other branches of government are remiss in their constitutional duties, the judiciary must act). In *Commonwealth v. Miller,* 585 Pa. 144, 888 A.2d 624 (2005), this Court defined mental retardation pursuant to a directive from the United States Supreme Court in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), where the General Assembly declined to formulate a standard. Accordingly, when the legislature has created a vacuum by failing to act, the courts must act where, as here, a potential constitutional violation is at issue. We should not, in the guise of judicial restraint, abdicate our fundamental responsibility to provide a proper framework for the assessment of actual constitutional violations. Thus, I now turn to an examination of how to determine uniformity in property taxation and how to determine whether a county's property tax assessment scheme has become unconstitutional.

Our constitution requires equality in taxation to the extent reasonably achievable. *Beattie v. Allegheny County,* 589 Pa. 113, 907 A.2d 519, 530 (2006). The statistical data relied upon by the trial court and cited by the Majority establish that the use of an indefinite base year system in Allegheny County has failed to conform to our Constitution's Uniformity Clause. As the Majority explains, inequity will rise at different rates in different taxing districts, depending upon the stability of property values in the municipality, the variety of real estate extant, and other market factors. Maj. at 715, 969 A.2d at 1229. Thus, it is not possible to predict the length of time

between reassessments which will result in a peculiar county's assessment morphing from constitutional to unconstitutional. Rather, to permit counties and taxpayers alike to have guidance as to when such mutation from a constitutional to unconstitutional system is occurring, this Court should adopt one of the well-established, judicially addressed, state verified and generally accepted measures of equality and inequality, as described by the Majority.

The standards cited by the Majority and established in the Standard on Ratio Studies issued by the International Association of Assessing Officers (IAAO) have been widely accepted as the criteria to judge the adequacy of an assessment. Specifically, the statistical indicator known as the coefficient of dispersion (COD) is the most widely accepted tool used to measure inequality in tax assessments, and is recognized as a suitable means of measuring inequality in property taxation in Pennsylvania.[2] The IAAO has characterized the COD as the most generally useful measure of variability or uniformity. *See* R.R. 1374a. *See also* IAAO's *Standard on Ratio Studies,* 13 (2006). A COD of fifteen indicates a low level of variance, and thus general or substantial uniformity in property assessment. In a county with a COD of fifteen, approximately fifty percent of property owners are neither over-assessed nor under-assessed by more than fifteen percent of fair market value. *See* Trial Ct. Op. at ii. Of the remaining property owners, half are over-assessed by at least fifteen percent of fair market value and half are under-assessed by at least the same percentage. Conversely, a high COD such as forty indicates a substantial level of variance, and thus inequality, in property assessments. Trial Ct. Op. at iii.

**2.** In *Beattie v. Allegheny County,* we described the COD as follows:

The coefficient of dispersion (COD) is the average deviation from the median, mean, or weighted mean ratio of assessed value to fair market value, expressed as a percentage of that figure. A "high coefficient of dispersion indicates a high degree of variance with respect to the assessment ratios under consideration. A low coefficient of dispersion indicates a low degree of variance. In other words, a low coefficient of dispersion indicates that the parcels under consideration are being assessed at close to an equal rate."

907 A.2d 519, 530 (Pa.2006) (internal citations omitted).

Because the COD is the most generally useful measure of uniformity, the IAAO has optimized its usage between establishing maximum acceptable CODs for various types of properties. *See* R.R. 1374a, *Standard on Ration Studies, supra.* According to the IAAO, the maximum COD for a single family residential property is ten percent for newer, more homogenous areas; fifteen percent for older, heterogeneous areas; and twenty percent for rural residential and seasonal properties. *See* Maj. at 1216–17; Trial Ct. Op. at 20. According to the testimony of the former executive director of the IAAO, which the trial court credited, the IAAO standards for acceptable CODs reflect a level of uniformity that is readily achievable. *See* Trial Ct. Op. at 20. These IAAO standards, which were first adopted in 1980, have never been readjusted and have withstood the test of time. T.C. Op. at 20, R.R. at 1383a–1384a. Further, these figures are easily obtained. Since 1988 the Pennsylvania State Tax Equalization Board (STEB) has published assessment statistics for each county in the Commonwealth, including the COD. The COD for each county in Pennsylvania is available over the internet to anyone. This availability limits the uncertainty regarding where a county's COD is in relation to the IAAO standards.

According to the COD standards established by the IAAO as discussed above, for counties where the current market value is the legal basis for assessment, a COD of twenty is the maximum COD envisioned by the IAAO before a county becomes generally non-uniform and should conduct a reassessment. Because a COD of twenty is the highest COD acceptable, once a county's COD, as demonstrated by STEB, reaches this threshold, it seems appropriate that a presumption should arise that the county's assessment scheme has become non-uniform and therefore unconstitutional in accord with the Uniformity Clause. Once this presumption arises, the county would have the choice to reassess, or await a lawsuit challenging its system. If such lawsuit was filed, the county would have the opportunity to rebut the arising presumption by demonstrating that its assessment system has not, in fact, become constitutionally infirm.

Ultimately, given the inequality of Allegheny County's property tax assessment system, as demonstrated before the trial court, I agree with the Majority's decision to remand this matter to the trial court to determine Allegheny County's progress in executing a countywide reassessment and to set a realistic timeframe for its completion.  Likewise, I would urge counties whose COD exceeds twenty to begin reassessment, or to stand ready to defend the lawsuit which will inevitably come.  Conversely, I would urge taxpayers whose counties' COD is less than twenty to recognize the unlikelihood of success in litigation, and to save themselves, their counties and the courts the massive resources that go into this type of litigation.