**[J-72A-2025 and J-72B-2025] [MO: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| DOWNINGTOWN AREA SCHOOL DISTRICT | : | No. 45 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court at No. 92 |
| | : | CD 2022 dated October 6, 2023, |
| | : | Reversing the Order of the |
| CHESTER COUNTY BOARD OF | : | Chester County Court of Common |
| ASSESSMENT APPEALS | : | Pleas, Civil Division, at No. 2019- |
| TAX PARCEL NO.: 33-5-43.3 | : | 11728-AB dated January 18, 2022 |
| | : | |
| | : | ARGUED:  September 11, 2025 |
| APPEAL OF:  DOWNINGTOWN AREA | : | |
| SCHOOL DISTRICT | : | |

| | | |
|---|---|---|
| DOWNINGTOWN AREA SCHOOL DISTRICT | : | No. 46 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court at No. 93 |
| | : | CD 2022 dated October 6, 2023, |
| | : | Reversing the Order of the |
| CHESTER COUNTY BOARD OF | : | Chester County Court of Common |
| ASSESSMENT APPEALS | : | Pleas, Civil Division, at No. 2019- |
| TAX PARCEL NO.: 33-5-43.2 | : | 11727-AB dated January 18, 2022 |
| | : | |
| | : | ARGUED:  September 11, 2025 |
| APPEAL OF: DOWNINGTOWN AREA | : | |
| SCHOOL DISTRICT | : | |

## DISSENTING OPINION

**JUSTICE DONOHUE**                                       **DECIDED:  May 19, 2026**

The Majority's opinion runs counter to the bedrock principles of uniformity and undermines this Court's precedent.  Accordingly, I dissent.[1]

---

[1]  I also join Justice Dougherty's dissenting opinion in full.

The Uniformity Clause provides that "[a]ll taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." PA. CONST. art. VIII, § 1. In *Valley Forge Tower Apartments v. Upper Merion School District*, 163 A.3d 962 (Pa. 2017), we held that, pursuant to the Uniformity Clause, a school district's policy of selectively reassessing commercial properties violated the Pennsylvania Constitution, reaffirming that "all property must be taxed uniformly ... throughout the taxing jurisdiction." *Id.* at 977, 980. Thus, such reassessment policies must not be directed by "the type of property in question or the residency status of its owner." *Id.* at 979. We explained that taxing entities' objectives should **not** be limited solely to generating necessary revenues; they must also ensure that taxes are imposed equitably. *Id.* Accordingly, we reasoned that "[w]here there is a conflict between maximizing revenue and ensuring that the taxing system is implemented in a non-discriminatory way, the Uniformity Clause requires that the latter goal be given primacy." *Id.* at 980. However, the Majority has instead decided to invert that principle, setting revenue maximization above the mandates of our Constitution.

We recognized in *Valley Forge* that taxing entities must use and acquire public funds wisely to "obtain[] needed revenues" to support important objectives; however, we stressed that "[t]he government must be concerned with ensuring a rough equalization of tax burdens under a structure in which taxes are imposed, adjusted, and collected equitably." *Id.* at 979. This means that while taxation may not always be perfectly equitable across all subclasses of realty, the policies of a taxing entity must be to effectuate as equitable a system of taxation as possible. *See Clifton v. Allegheny Cnty.*, 969 A.2d 1197, 1212 (Pa. 2009) ("Taxation, however, is not a matter of exact science; hence absolute equality and perfect uniformity are not required to satisfy the constitutional

uniformity requirement. Some practical inequalities are obviously anticipated, and so long as the taxing scheme does not impose substantially unequal tax burdens, rough uniformity with a limited amount of variation is permitted.") (citations omitted). Thus, we recognized that the "two objectives do not necessarily conflict." *Valley Forge*, 163 A.3d at 980. That is not to say that the conflict does not exist—our rationale clearly states otherwise—but rather that in practice the conflict will arise. When this conflict between inequitable taxation and revenue generation goes too far, the resolution is clear—we follow our Constitution. In other words, when business decisions to maximize revenue are given more weight than the goals of the Uniformity Clause, a taxing policy is patently unconstitutional. *Id.* at 980. Unfortunately, ignoring our stated prioritization, the Majority's takeaway from *Valley Forge* is simply that "maximizing revenue and ensuring non-discriminatory implementation of the taxing system do not necessarily conflict[.]" Majority Op. at 10 n.11. Thus, the Majority is of the mind that there is no conflict between these two goals. Its rationale supports the notion that so long as a taxing entity is seeking to maximize revenue, however they do so is effectively irrelevant.

According to the Majority, there is no indication that the School District "was motivated to appeal the subject property because of its type, usage, or where its new owner lived; rather, it was **a transparent attempt to obtain more tax money** by conforming the property's assessment to the [common-level ratio ('CLR')]." Majority Op. at 21 (emphasis added). While the Majority may be correct that this is the practical "purpose of Section 8855[,]"[2] *id.*, the "statutory right to appeal assessments … alone

_____

[2] Section 8855 provides:

> A taxing district shall have the right to appeal any assessment within its jurisdiction in the same manner, subject to the same procedure and with like effect as if the appeal were taken by a taxable person with respect to the assessment, and, in addition, may take an appeal from any decision of the board

(continued…)

cannot justify action which the Uniformity Clause prohibits." *Valley Forge*, 163 A.3d at 978. Thus, a tax policy cannot solely be intended for the purpose of maximizing revenue regardless of the consequences. If that were the case, then this Court would never have found any taxing policy in violation of the Uniformity Clause. But the Majority has seen fit to approve any taxing scheme if the taxing entity seeks to maximize revenue and does not publicize its intention to **only** seek reassessment of those properties that will provide the government with the most money.

In discussing the methodology of the School District's consultant, the Majority endorses the practice of "maximiz[ing] the return" so long as the properties selected for reassessment are those "expected to yield the greatest collective return to the school district." Majority Op. at 23. The simplest way to do this, of course, would be to only reassess those properties of the highest value. It comes as no surprise that commercial, industrial, and apartment complex properties are all higher value properties compared to single-family residential properties.[3] *Valley Forge*, 163 A.3d at 966 (noting that commercial property values are "generally higher than those of single-family homes"). The Majority recognizes precisely this fact. *See* Majority Op. at 27. In explaining why only commercial properties have been reassessed under the School District's policy, the Majority notes that this is "due to the value of such properties," but "[i]f market forces change so that single-family residences rise in value compared to commercial properties,

or court of common pleas as though it had been a party to the proceedings before the board or court even though it was not a party in fact. A taxing district authority may intervene in any appeal by a taxable person under section 8854 (relating to appeals to court) as a matter of right.

53 Pa.C.S. § 8855.

[3] For ease of reference, I shall hereinafter refer to commercial, industrial, and apartment complex properties collectively as "commercial properties."

it is expected that more residential properties will be appealed at that juncture[.]" *Id.* at 26-27. The likelihood of the market value of the typical single-family residence increasing to a valuation comparable to that of commercial properties is effectively non-existent. Thus, under the Majority's revenue maximization justification, single-family residences could never be reassessed, and this would satisfy the Majority's understanding of the Uniformity Clause.[4]

---

[4] The Majority explains that by relying on monetary thresholds—both in this case and in *GM Berkshire Hills v. Berks County Board of Assessment Appeals*, 290 A.3d 238 (Pa. 2023)—taxing entities have identified single-family residential properties. Majority Op. at 31 n.32. To the Majority, this puts its holding with respect to revenue maximization and monetary thresholds on safe ground. While I am of the position that significantly fewer single-family residences will be capable of generating sufficient revenue to meet the instant monetary threshold if they are even reviewed, this is not my principal concern with the Majority's holding. First and foremost, for the reasons set forth in Justice Dougherty's dissenting opinion, I agree that the School District's monetary threshold is unconstitutional. Dissenting Op. at 3-11 (Dougherty, J., dissenting). It could "easily serve as [a] method[] of circumventing our holdings, in cases such as *Clifton* and *Valley Forge Towers*, as [it] could be set at amounts that would largely target only certain neighborhoods" or subclasses of property. *G.M. Berkshire*, 290 A.3d 238, 253 n.5 (Pa. 2023) (Donohue, J., Opinion in Support of Reversal). Even if "one residence is appealed" in a given tax year, that will not necessarily square a taxing policy with the Uniformity Clause. Majority Op. at 31 n.32. When the methodology is unconstitutional, the result is irrelevant.

My principal concern is the Majority's holding that tax policy decisions can be driven solely by the government's desire to maximize revenue. This renders monetary thresholds completely irrelevant. *See* infra pp. 6-7. By setting revenue maximization as the goal, all that matters is the actual value of the properties themselves, not whether it can reach a fictitious monetary threshold. Because the value of commercial properties are generally much higher than the average single-family residence, the Majority's methodology ensures that single-family residential properties will never be selected for reassessment.

We see this borne out in the instant case. Despite single-family residences comprising 84.2% of all properties in the jurisdiction, *see* infra p. 7 & note 5—and, as the Majority highlights, there may have at least "thirty single-family residences that met the $10,000 threshold," Majority Op. at 31 n.32—no such properties were appealed. That is because when the policy is revenue maximization, the government is bound to select the highest value properties.

The Majority fully acknowledges that the School District's policy resulted in zero appeals of residential properties in the relevant tax year. *Id.* at 27 (observing that no residential properties were appealed in the "tax year 2020"). Under this same policy, in fact, we only have a reference to a **single** other instance of a residential property being reassessed "a number of years ago." N.T., 6/2/2021, at 18. That appeal was notable to the president of the School District's board at the time, as it "surprised" her that a residential property could generate $10,000 more in revenue. *See id.* at 20 ("[F]rom my perspective, I was surprised the house could generate that much more in revenue."). The Majority has no problem with this result because, in its view, the result of a policy is irrelevant to the Uniformity Clause. All that matters is that a taxing entity does not publicly state its policy to subject a subclass of property to differential treatment. Majority Op. at 29 ("The Uniformity Clause focuses on purposeful differential **treatment**, not differential **impact**.") (emphasis in original).

Again, based on its view that maximization of revenue is a singularly appropriate tax policy justification, the Majority explains that

> [a] neutral, systematic treatment of all properties might affect different properties differently due to their economic value, which varies as the economy and markets fluctuate. To violate the Uniformity Clause, the classification would have to be drawn in a way that indicates the members of one class will be treated differently regardless of such changes, which did not occur here.

*Id.* In other words, single-family residential properties have less market value compared to commercial properties and thus, until that changes, only commercial properties will be reassessed under the School District's policy. Short of the entire collapse of all elements of the commercial realty sectors, it is hard to imagine when, if ever, the market will fluctuate in such a manner that the average single-family residence will be able to generate revenue comparable to that of commercial properties. However, because the

Majority finds the School District's policy to be "facially neutral," *id.* at 25, the effect or intention behind the School District's policy can be completely ignored.

Coupled with its flawed conclusion that tax equalization is not to be prioritized over maximizing revenue, the Majority proclaims, for the first time in this Court's history, that the use of monetary threshold tax policies is lawful. It is this policy that the Majority finds to be "facially neutral" for purposes of the instant matter; or rather, it finds that such a policy does not violate the Uniformity Clause "without more[.]" Majority Op. at 10. I can only assume that the "more" the Majority is referring to is an express policy to subject only one subclass of realty to a monetary threshold. Otherwise, it would seem that it has justified the use of any monetary threshold, regardless of the amount. Even here, where single-family residences make up 84.2% of all properties in the jurisdiction,[5] the Majority finds no problem where none of those properties are subject to appeal. N.T., 11/17/2021, at 77. This blessing results from the Majority's position that the maximization of revenue is an acceptable selection criterion without regard to the constitutional mandate to prioritize equalization of tax burdens among all classes of real property. However, in endorsing this maximization of revenue rationale, the Majority renders monetary thresholds entirely irrelevant. If all that matters is the maximization of revenue, then what purpose does a monetary threshold serve? Under the Majority's rationale, regardless of the chosen threshold, the same properties will be selected for appeal—those that generate the most revenue. Under this framework, monetary thresholds merely serve as a guise for policies seeking to appeal only those properties with the highest value.

It is axiomatic that the values of commercial properties are "generally higher than those of single-family homes, and hence, raising their assessments would result in a

---

[5] Apartment, commercial, and industrial buildings make up 3.2% of all properties in the School District, and yet these properties comprise 100% of the School District's 2019 appeals. N.T., 11/17/2021, at 78.

greater tax-revenue increase[.]" *Valley Forge*, 163 A.3d at 966. To the Majority, so long as a taxing entity seeks to maximize revenue under the guise of a monetary threshold, the government can put into place a taxing scheme that results exclusively in appeals of commercial properties. The Majority has manufactured a loophole to uniformity. It endorses a method of taxation that will result in the appeal of only commercial properties so long as the government does not publicize its intent to do so. That is precisely what happened here. We cannot blind ourselves to the reality of a taxing scheme that exclusively targets commercial properties for assessment appeals.

The School District is doing indirectly what it cannot do directly, i.e., selectively appealing commercial properties. Even if the School District had good intentions and sought to be fiscally responsible, "any intentional or systematic enforcement of the laws" that "treats commercial properties differently from other types of parcels" is unconstitutional. *Valley Forge*, 163 A.3d at 975. The $10,000 threshold which was driven by the goal to maximize revenue caused the School District's third-party consultant to focus almost exclusively on commercial properties. Here, the consultant limited his review of single-family residential properties to only those that were 3,500 square feet or more, which eliminated an unknown—though likely considerable—number of such properties for consideration. N.T., 11/17/2021, at 27. This was all in an effort to maximize revenue, the "hard and fast rule," the Majority is so quick to endorse. Accordingly, the School District's consultant was effectively required to treat commercial properties as the only targets for appeal. This policy clearly results in decisions that discriminate against one subclass of property, and thus, it is in violation of the Uniformity Clause.

Based on the above, I conclude that the School District's policy violates the Uniformity Clause. Accordingly, I dissent.

Chief Justice Todd and Justice Dougerty join this dissenting opinion.